# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW JERSEY

KHALED ELSISI, NAJY KANAN, AHMED
KHDER, RICARDO MARQUEZ, ASHER
BOMANI LEWIS, LUIS PINOS, CHRISTINE
LINDA MASTERS, AHMED SHARAFELDIN,
LINWOOD WALKER, BARRY ROSNER,
STUART WAYNE SPRINGFIELD, ROBERT
YENG, JUAN JUNIOR NICASIO, GABRIELA
JANETA ROMAN, CHRISTOPHER EMANUEL
SZABO, and ALIQWAN PACK

Civil Action No. 2:23:cv – 20773
JURY TRIAL DEMANDED

       **Plaintiffs**

  **v.**

CFT SOLUTIONS, LLC, ARTHUR PERCY,
RENAN DE ROCHA GOMES BASTOS,
YVENSON ISRAEL, DIVINE-SEVEN EL,
CHUCK MARSHALL, MICHAEL JEX, and
ELIDO SANTANA

       **Defendants**

## <u>AMENDED COMPLAINT</u>

Plaintiffs, Khaled Elsisi ("Elsisi"), Najy Kanan ("Kanan"), Ahmed Khder ("Khder"), Asher Bomani Lewis ("Lewis"), Ricardo Marquez ""Marquez"), Christine Linda Masters ("Masters"), Luis Pinos ("Pinos"), Gabriela Janeta Roman ("Roman"), Barry Rosner ("Rosner"), Ahmed Sharafeldin ("Sharafeldin"), Stuart Wayne Springfield ("Springfield"),

Christopher Emanuel Szabo ("Szabo"), Linwood Walker ("Walker"), Robert Yeng ("Yeng"), Juan Junior Nicasio ("Nicasio"), and Aliqwan Pack ("Pack") (collectively, the "Plaintiffs"), pro se, commence this action against CFT Solutions, LLC ("CFT"), and Renan de Rocha Gomes Bastos ("Bastos"), Yvenson Israel ("Israel"), Arthur Percy ("Percy"), Chuck Marshall ("Marshall"), Divine-Seven EL ("EL"), Michael Jex ("Jex") and Elido Santana ("Santana") (collectively the "Defendants"), and allege as follows:

## PRELIMINARY STATEMENT

1.      Plaintiffs, a group of investors from New Jersey, other states, and Australia engaged with CFT and its associated entities, including FxWinning, under the belief that they were entering into a legitimate and profitable investment opportunity. The plaintiffs were assured of the safety and profitability of their investments through various communications, including presentations and personal assurances from the defendants.

2.      The Defendants knowingly participated in a scheme that defrauded the Plaintiffs out of a total amount exceeding $1.5 million, as measured by net deposits. The Plaintiffs' losses exceeded $2.3 million, as measured by the last balance shown in their accounts when withdrawals were halted.

3.      The premise of the scheme was to lure investors with the promise that CFT would provide software for high-frequency trading (HFT) in the foreign exchange (FX or Forex) markets. CFT, along with its agents and the Defendants, represented to potential investors that they could achieve spectacular returns by using this software.

4.      Investors were instructed to open an account with CFT's designated broker, FxWinning LTD, where the CFT software would trade the accounts with discretion, meaning without any input or oversight from the Plaintiffs (Exhibit 1 – LPOA Clause).

5.      Upon information and belief, FxWinning and CFT are jointly owned and managed. Bastos, the CEO of CFT, created a substantial portion of the content for the

FxWinning.pro website (Exhibit 2 – Brito's Statement) and maintained regular communication with the CEOs of FxWinning, Merino and Brito. Additionally, Percy, the COO of CFT, maintained communication with both Merino and Brito and met Brito in person in Dubai, where Brito resides. Following the cessation of withdrawals, both Bastos and Israel visited Brito in Dubai (Exhibit 3 – Merino, Brito, and Israel Statements on Dubai Visits).

5.       The board of CFT, as is known to the Plaintiffs, was represented by the CEO (Bastos), COO (Percy), and two high-ranking Government officials (Exhibit 4 – Board of CFT).

6.       In February 2023, FXWinning stopped processing withdrawal requests, and in June 2023, it announced the closure of its operations. To date, the Plaintiffs' funds remain unreturned. Upon information and belief, the Defendants received significant portions of the Plaintiffs' funds through undisclosed commissions, ranging from 10% for agents to as much as 40%-50% for CFT, along with other payments unknown to the Plaintiffs at the time.

7.       On May 5, 2023, CFT sued FxWinning in Florida, initially for "breach of contract" (case number 2023-016392-CA-01). Later, they amended the complaint to include RICO Act violations and fraud. The Plaintiffs, based on evidence, allege this lawsuit is a distraction meant to make investors believe FxWinning is solely to blame for their losses and that CFT is also a victim. They also believe this lawsuit is intended to delay any potential legal action against CFT by investors, hoping the statute of limitations will run out first.

8.       This Honorable Court partially ruled on personal jurisdiction and ordered jurisdictional discovery.

9.       Defendants defaulted in answering the complaint and did not ask for an extension, while Israel did not comply with the judge's order for initial disclosure as well.

10.     Jex and Santana, who tied the case to NJ defaulted and did not respond to the summons. Marshall, a sub-agent, also defaulted and did not respond to the summons.

11.     Plaintiffs' attorneys withdrew from representation and informed the court they are refusing to do anything for the plaintiffs until the judge rules on their motion to withdraw.

12.     This Court responded and ordered an in-person conference on October 9, 2024, where all the counsels and plaintiffs must attend, including the two plaintiffs from Australia and three from different other states.

13.     On October 9, 2024, the ruling on the motion to withdraw was postponed to November 18, 2024, due to the Plaintiffs' counsel improperly withdrawing from representation.

14.     During a Zoom hearing on February 25, 2025, the Court granted Plaintiffs pro se status and acknowledged that it could not prevent them from submitting an amended complaint. The Defendants' counsel did not object to this statement.


**THE PARTIES**

15.     Plaintiff Khaled Elsisi is an individual over the age of eighteen who resides in New Jersey.

16.     Plaintiff Najy Kanan is an individual over the age of eighteen who resides in New Jersey.

17.     Plaintiff Ahmed Khder is an individual over the age of eighteen who resides in New Jersey.

18.     Plaintiff Asher Bomani Lewis is an individual over the age of eighteen who resides in Nevada.

19.      Plaintiff Ricardo Marquez is an individual over the age of eighteen who resides in New Jersey.

20.      Plaintiff Christine Linda Masters is an individual over the age of eighteen who resides in Australia.

21.      Plaintiff Luis Pinos is an individual over the age of eighteen who resides in New Jersey.

22.      Plaintiff Gabriela Janeta Roman is an individual over the age of eighteen who resides in Florida.

23.      Plaintiff Barry Rosner is an individual over the age of eighteen who resides in New Jersey.

24.      Plaintiff Ahmed Sharafeldin is an individual over the age of eighteen who resides in New Jersey.

25.      Plaintiff Stuart Wayne Springfield is an individual over the age of eighteen who resides in Australia.

26.      Plaintiff Christopher Emanuel Szabo is an individual over the age of eighteen who resides in Florida.

27.      Plaintiff Linwood A. Walker is an individual over the age of eighteen who resides in New Jersey.

28.      Plaintiff Robert Yeng is an individual over the age of eighteen who resides in New Jersey.

29.      Plaintiff Juan Junior Nicasio is an individual over the age of eighteen who resides in New Jersey.

30.      Plaintiff Aliqwan Pack is an individual over the age of eighteen who resides in California.

31.    Upon information and belief, Defendant CFT is a Delaware limited liability company, with its principal place of business located in Miami-Dade County, Florida.

32.    Upon information and belief, Defendant Renan de Rocha Gomes Bastos is an individual over the age of eighteen who resides in Florida and the Chief Executive Officer (CEO) of CFT.

33.    Upon information and belief, Defendant Yvenson Israel is an individual over the age of eighteen who resides in Florida.

34.    Upon information and belief, Defendant Arthur Percy is an individual over the age of eighteen who resides in Florida and is the Chief Operating Officer (COO) of CFT.

35.    Upon information and belief, Defendant Divine-Seven EL is an individual over the age of eighteen who resides in Florida.

36.    Upon information and belief, Defendant Chuck Marshall is an individual over the age of eighteen who resides in Arizona.

37.    Upon information and belief, Defendant Michael Jex is an individual over the age of eighteen who resides in Florida.

38.    Upon information and belief, Defendant Elido Santana is an individual over the age of eighteen who resides in Florida.

## INTRODUCTION OF TWO NEW NJ PLAINTIFFS

## JUAN JUNIOR NICASIO and ALIQWAN PACK

39.    Plaintiffs hereby introduce Juan Junior Nicasio as a new plaintiff in this action. Mr. Nicasio, a resident of New Jersey, is an acquaintance and long-time social media follower of Israel (Exhibit 5 – Nicasio Old Acquaintance of Israel). Over the course

of several years, Nicasio observed Israel frequently showcasing the wealth he allegedly acquired through a particular forex investment.

40.     Through a series of posts, Israel consistently encouraged his followers to invest, frequently enticing them with promises of substantial financial returns and extolling the performance of the software. This social media activity, documented in Exhibit 6 (Israel's Posts on Facebook), showcases Israel urging his followers to join the investment opportunity while enthusiastically praising its results.

41.     Compelled by Israel's apparent success and persistent encouragement, Mr. Nicasio decided to invest his money following Israel's specific instructions and loaded his USA ID at FxWinning's site. This initial investment led to Nicasio becoming a victim of the broader fraudulent scheme orchestrated by the defendants.

42.     When withdrawals from the investment were halted, Israel took further steps to deceive Mr. Nicasio. In an attempt to facilitate a withdrawal, Israel arranged for the creation of a fake Haitian corporation for Mr. Nicasio, fully aware that no actual withdrawals would be processed.

43.     FxWinning made it clear that investors couldn't take legal action against them if they used false documents or information. This was because Isreal, and all the members of CFT and FXWinning knew that deceptive information and fake documents were used to ensure the investors would not comply with FXWinning's policy. This demonstrates that the Defendants deliberately ensured the Plaintiffs would provide false information (Exhibit 7 – Posts from FxWinning Site About Fake Documents).

44.     Mr. Nicasio's experience illustrates the manipulative tactics employed by Israel and underscores the broader fraudulent operation that exploited personal connections and social media influence to lure and deceive investors.

45.     Plaintiffs hereby introduce Aliqwan Pack as a new plaintiff in this action. Mr. Pack is a long-time friend and Facebook follower of Israel, with whom he has had a personal and business relationship spanning many years. Prior to the investment scheme at issue, Mr. Pack and Israel had engaged in various business ventures together (Exhibit 8 – Longstanding Relationship with Israel).

46.     Mr. Pack is a native of New Jersey and continues to maintain significant ties with the state, including family and property. In late 2019, Mr. Pack secured employment as a remote IT specialist based in California, though he frequently travels between New Jersey and California several times a year. Despite his current residence in California, Mr. Pack's primary connections remain in New Jersey, a fact known to Israel.

47.     At the time of signing the Limited Power of Attorney (LPOA) for investment in question, Mr. Pack used his California address. However, given his substantial and continuous ties to New Jersey, including Israel's knowledge of his New Jersey residency, Mr. Pack's involvement in this case further supports the jurisdictional basis of this court.

48.     Plaintiffs respectfully request that the court allow the inclusion of Aliqwan Pack as a new plaintiff in this matter, and that his claims be considered alongside those of the existing plaintiffs.

49.     Many of the Plaintiffs, including the two new plaintiffs, were followers of Defendant Israel on social media. Masters, Springfield, and Lewis were actively engaging with his posts, as evidenced by their comments on his Facebook posts (Exhibit 9 – Pack and Nicasio Interactions with Israel's Social Media Posts). Numerous other Plaintiffs regularly read his posts without commenting.

## **VENUE**

The venue is proper in this court for many reasons and pursuant to:

50.    Under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968, venue is proper in this district as the defendants conducted and participated in racketeering activities affecting interstate commerce within this jurisdiction as part of their ongoing criminal enterprise.

51.    Venue is proper in this district under the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-78qq, as the alleged fraudulent activities in connection with the trading of securities were conducted in this district, or the defendants are found or transact business in this district.

52.    Under the New Jersey Uniform Securities Law, N.J.S.A. 49:3-47 et seq., which regulates the offering and sale of securities within the state to protect investors from fraud, venue is proper in this Court as the fraudulent acts and misrepresentations affecting the Plaintiffs occurred within the State of New Jersey.

53.    In accordance with 7 U.S.C. § 25(c) of the Commodities Exchange Act, venue is proper in the District of New Jersey. The defendants, directly or through their agents, transacted business within this district by soliciting New Jersey residents to participate in their fraudulent investment scheme. Several plaintiffs reside in New Jersey, where they were offered and sold investment products by the defendants, and the violations occurred in part within this district as the defendants' misrepresentations, false promises, and manipulative acts impacted New Jersey-based investors.

> *7 U.S.C. § 25(c) — Any action brought under this section may be brought in the district wherein the defendant is found, is an inhabitant, or transacts business, or in the district wherein the violation occurred, or in the district wherein the plaintiff resides if the defendant participated in an offering or selling in such district.*

54.    Venue is proper in New Jersey under the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1 et seq., as it provides protection against deceptive business practices,

fraud, and misrepresentation that have directly impacted New Jersey residents and occurred within the state.

55.    Under the Federal Rules of Civil Procedure, the venue is proper in this District because a substantial part of the events or omissions give rise to the claims that occurred in New Jersey, even though none of the defendants reside in the state.

56.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because acts that form the basis of this Action occurred in this district.

57.    Given the complexity of this case with plaintiffs from New Jersey, other states, and Australia, and multiple defendants including a corporation, its CEO, COO, software co-founder, and agents, the case involves fraud and racketeering related to a forex investment scheme. The defendants used social media, co-agents, friends, acquaintances, and relatives to gain followers, created fake documents, and had connections to New Jersey. As a result, both federal and state laws are relevant in these proceedings.

## <u>JURISDICTION</u>

The jurisdiction is proper in this court for many reasons and pursuant to:

58.    Federal Rule of Civil Procedure 4(k)(1)(A): This rule provides that a federal court may exercise personal jurisdiction over a defendant who is subject to the jurisdiction of a court of general jurisdiction in the state where the federal court is located.

59.    Racketeer Influenced and Corrupt Organizations Act (RICO) - 18 U.S.C. § 1965: Under RICO, the federal court can assert jurisdiction over defendants if the court can establish that they participated in an enterprise that affected interstate or foreign commerce. RICO provides for nationwide service of process.

60.     The defendants are subject to personal jurisdiction in New Jersey under the Commodities Exchange Act (CEA), 7 U.S.C. § 25(c), and 28 U.S.C. § 1331 for engaging in fraudulent foreign currency (forex) trading, a commodity under the CEA, and soliciting New Jersey residents. By conducting business, soliciting investments, and communicating with New Jersey plaintiffs via agents and the CFT Telegram channel, the defendants established sufficient minimum contacts. Their fraudulent activities, including misrepresentation and manipulation of forex trades, directly harmed New Jersey plaintiffs. Therefore, it is reasonable for the New Jersey federal court to exercise personal jurisdiction, invoking *federal question jurisdiction* for violations of federal commodities laws.

61.     This Court has subject-matter jurisdiction over this Action pursuant to 28 U.S.C. § 1331 because the case arises, in part, under § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. and Civil RICO 18 U.S.C. §1962(c) and (d).

62.     This Court has supplemental jurisdiction over the state law claims in this Action pursuant to 28 U.S.C. § 1367 because such claims are so closely related to the Exchange Act and RICO Act claims that they are part of the same case and controversy.

63.     New Jersey Long-Arm Statute - New Jersey Court Rule 4:4-4(b)(1): This statute allows New Jersey courts to fully exercise personal jurisdiction over non-residents permitted by the U.S. Constitution. This means that if the defendants have minimum contact with NJ, the courts can exercise personal jurisdiction over them.

64.     Minimum Contacts Doctrine - Derived from the Due Process Clause of the Fourteenth Amendment, this doctrine requires that a defendant has sufficient minimum contact with the forum state (New Jersey) such that maintaining the lawsuit does not offend traditional notions of fair play and substantial justice.

65.    Purposeful Availment **-** A principle under the Due Process Clause which examines whether the defendant purposefully directed activities at residents of the forum state.

66.    Under New Jersey law, the role of an attorney-in-fact established through a Limited Power of Attorney (LPOA) creates a formal and binding agency relationship, wherein the agent (Defendants) is empowered to act on behalf of the principal (Plaintiffs). This relationship inherently ties the agent's actions to the forum state where the principal resides, as recognized under general agency law (*Restatement (Second) of Agency § 12*). By accepting and exercising the attorney-in-fact authority for New Jersey residents, the Defendants purposefully engaged in activities directed toward this state. Such conduct establishes the requisite minimum contacts necessary for personal jurisdiction under New Jersey's Long-Arm Statute, *N.J. Court Rule 4:4-4(b)(1)*, and the Due Process Clause of the U.S. Constitution.

66.    Personal jurisdiction exists over Defendants because this dispute arises out of, or is related to, the Defendants' contacts with this forum. Defendants have purposefully conducted business in New Jersey by soliciting investments from individuals residing in New Jersey and have caused harm.

**Jurisdiction over CFT**

67.    CFT Solutions, a Delaware LLC registered in July 2022 and operating out of Florida, was the centerpiece of an interstate RICO enterprise. Its board members, residing in Florida, Iowa, and Indiana, received regular payments, evidencing their active participation in CFT's ongoing operations. Led by CEO Bastos and COO Percy, CFT oversaw a network of agents who acted under their directives and received commissions. This structure makes CFT directly responsible for the fraudulent actions that harmed Plaintiffs., including those in New Jersey.



68.    To expand its scheme, CFT's board members and agents enlisted sub-agents, acquaintances, and family members—individuals who were not formally on CFT's payroll. This extended network created fraudulent documents and engaged in deceptive schemes targeting investors in multiple states, including New Jersey. These coordinated

efforts spanned more than two years, reflecting the deliberate and systematic nature of CFT's operations.

69.     While publicly portraying itself as a software provider, CFT functioned as a broker for Plaintiffs' investments. CFT's software handled the trading of all investor funds, including those from New Jersey, and mandated the use of FxWinning as the exclusive broker. This contradicts CFT's public representations and establishes its significant control over Plaintiffs' investments.

70.     CFT used deceptive methods to onboard investors, including those in New Jersey. These tactics involved fake IDs, routing investor registrations through the U.S. Virgin Islands instead of directly in the U.S. and facilitating the creation of fake offshore corporations. CFT's agents and sub-agents, acting under uniform directives, carried out these practices regardless of their familiarity with each other.

71.     The scheme operated through a synchronized network: agents, sub-agents, and associates adhered to identical rules under CFT's oversight. Investors were required to sign Limited Power of Attorney (LPOA) agreements and rely on documents produced by CFT's chosen creators. This uniformity underscores CFT's central control over the scheme and strengthens its connection to New Jersey.

72.     The Limited Power of Attorney (LPOA) granted CFT authority over Plaintiffs' investments, including those of New Jersey residents. By assuming fiduciary responsibility for New Jersey-based assets, CFT created a direct legal connection to the state. This authority subjects CFT to New Jersey jurisdiction under laws governing fiduciary duties and investment activity. The CFTraders LPOA explicitly names the "Representative" as CFT and the "Firm" as FxWinning.

73.    The LPOA template was provided to all agents by CFT and Bastos, as stated by Israel under oath during a deposition in the case *CFT Solutions v. FxWinning*.

```
9     A.   Correct.
10    Q.   And who put that reference number in their
11 LPOAs?
12    A.   It was automatically given to us by CFT.
13    Q.   So CFT knew --
14    A.   Uh-huh.
15    Q.   -- to put your reference number in those
16 LPOAs.
17    A.   Correct.  It wasn't a -- a different LPOA.  It
18 was the same LPOA.  So they would give you a LPOA, and
19 the LPA would have your reference number in there.  If
20 you had a family or a friend that wanted to get involved
21 in the business, you would give them the LPOA.
22    Q.   I see.
23    A.   Yeah.
24    Q.   So you had a template LPOA --
25    A.   Uh-huh.
```

74.    Paragraph 4.1: "By signing this Power of Attorney ('POA'), the Client agrees to authorize the Representative to act as his/her/their attorney-in-fact and in-law for the purposes described below, regarding the services offered by CFTraders." This provision formalized CFT's role as attorney-in-fact for Plaintiffs Marquez, Pack, and Nicasio, establishing deliberate and sufficient minimum contacts with New Jersey.

4.1    By signing this Power of Attorney ('POA'), the Client agrees to authorize the Representative to act as his/ her/ their attorney-in-fact and in- law for the purposes described below, regarding the services offered by CFTraders.

75.    Paragraph 5.1: "The Client understands and accepts that the Representative shall be entitled to have the powers granted herein below, in accordance with the Service Agreement. The Client agrees to ratify such instructions, as if performed by themselves." By ratifying CFT's actions under this agreement, Plaintiffs bound those actions to New Jersey, demonstrating CFT's purposeful availment of this jurisdiction.

5.1    The Client understands and accepts that the Representative shall be entitled to have the powers granted herein below, in accordance with the Service Agreement. The Client agrees to ratify such instructions, as if performed by themselves. Therefore, the Firm, prior to execution, is under no responsibility to confirm such instructions with neither the Representative nor the Client. The Client understands that CFTraders will facilitate the above transactions without further direction and/or confirmation from the Client.

76.    Paragraph 5.4 and 7: "The Client consents and authorizes the Firm to disclose to the Representative any personal information and trading-related information necessary under this POA." CFT's requirement to access New Jersey Plaintiffs' personal and financial information constitutes deliberate contact with this forum, satisfying jurisdiction under New Jersey's Long-Arm Statute.

5.4    The Client consents and authorizes the Firm to disclose to the Representative any personal information and trading related information necessary under this POA.

7. Powers Granted to the Attorney

*I, the Client, hereby ratify and confirm all and any of the following acts to be performed by the Representative as having been performed by myself. \*Tick either (a) or (b)*

The Representative shall have:

a.)   Funding activities:
- Depositing and/or withdrawing money to and from my account with CFTraders, with

> **Account Number (MT5):** 1 2 3 7 6 7

- Permitting CFTraders to disclose to the Representative any account related information.

77.     CFT misused its LPOA authority by engaging in fraudulent activities, misappropriating investor funds, and fabricating documents. These breaches of fiduciary duty caused direct harm to Plaintiffs in New Jersey. Under established legal principles, such wrongful acts by an attorney-in-fact create grounds for jurisdiction in the state where the injured parties reside.

78.     CFT established substantial connections with New Jersey through its official Telegram channel, serving as the sole communication tool for all investors (Exhibit 10 – CFT Channel on Telegram). Plaintiffs, including those from New Jersey, were required to join this channel upon registration, with access granted exclusively via a unique link provided during the process (Exhibit 11 – Plaintiffs Joined CFT Channel).

79.     CFT's CEO, Bastos, and COO, Percy, further solidified these connections by hosting live and Zoom meetings, as well as organizing events through the platform, thereby strengthening CFT's ties to New Jersey. Additionally, CFT frequently sent the same communications via email, which not only demonstrates their contact with New Jersey but also indicates that CFT maintained access to every investor's email (Exhibit 12 – Announcements of Zoom meetings and Events).

80.    CFT's systematic and deliberate actions—including financial transactions, fraudulent activities involving fake corporations, and recruitment of investors—demonstrate purposeful engagement with New Jersey. These ongoing contacts clearly satisfy the minimum contacts requirement for specific jurisdiction in this state.

**Jurisdiction over CFT's CEO, Bastos**

81.    Bastos, as the CEO of CFT, exercised overarching control over the company's operations, including the creation, implementation, and enforcement of Limited Power of Attorney agreements (LPOAs), such as CFTraders, IWT, and CFTs. These agreements served as the foundation for investor engagement and were uniformly provided as templates to agents acting under Bastos's authority.

82.    Plaintiffs Marquez, Nicasio, Pack, Lewis, and Szabo each executed CFTraders LPOAs through their respective agents—Santana and Jex for Marquez, Israel for Lewis, and El for Szabo. Importantly, while these agents operated independently and some lacked familiarity with one another, they all utilized identical LPOA templates supplied by CFT.

```
13   number for them to make commissions off of your trades?
14        A.    No, it was automatically on the -- on the
15   document.
16        Q.    Who prepared the document?
17        A.    The LPOA is a LPOA that CFT would give up.
18        Q.    So when -- going back to your specific account
19   when you signed up.
20        A.    Uh-huh.
21        Q.    CFT Solutions prepared a limited power of
22   attorney --
23        A.    Uh-huh.
```

83.    Bastos played a hands-on role in CFT's daily operations and investor recruitment strategies. He was frequently seen alongside key figures—Israel, El, and Percy—at business meetings and events. Notably, Bastos:

- Traveled to Dubai with Israel to secure insurance for investor funds (Exhibit 3).
- Attended car meets in Ft. Lauderdale with El, where they directly recruited investors (Exhibit 13 – Bastos with El at Car Meets in Florida).

These actions demonstrate Bastos's personal involvement in CFT's investor acquisition processes, including targeting U.S.-based investors, despite the notable fact that CFT and FxWinning were not accepting any North American, and other certain countries, investors (Exhibit 14 – CFT and FxWinning Stating No USA Investors).

84.    Bastos solidified direct connections to New Jersey through:

- Hosting Zoom meetings where CFT's investment strategies and software performance were promoted to investors, including those in New Jersey.
- Communications sent via CFT's official Telegram channel—an official platform accessed by all investors including NJ investors.
- Attending social gatherings such as the Bahamas convention and a boat event, which included New Jersey residents. These gatherings served as promotional platforms where Bastos marketed CFT's investment scheme and bolstered investor trust (Exhibit 15 – Bahamas and Video Link to Boat Party                                                                          - https://drive.google.com/file/d/10F4fiaBQawPtxQpOJr2NVai4D6f_ndcc /view?usp=sharing – Israel, El, Bastos are in the video along with investors on January 23, 2022. Plaintiff Szabo attended the boat party).

85.    Bastos oversaw and directly engaged in practices targeting U.S. and NJ investors, despite CFT's and FxWinning's claims to the contrary. Under his leadership:

- Agents registered investors using false IDs or misrepresented addresses as the U.S. Virgin Islands instead of the USA.
- Fake offshore corporations were facilitated to bypass regulatory scrutiny. These deceptive tactics misled investors, including those residing in New Jersey, into believing their funds were secure.

86.    Bastos's central role is further evidenced by his private discussions with FxWinning's CEO, Merino, regarding offshore corporations. There is no indication that agents were involved in or aware of this discussion. The idea was subsequently disseminated among agents by Bastos himself, creating a coordinated scheme that misled investors (Exhibit 16 – Bastos's Coordination with Merino on Establishing Offshore Corporations).

87.    Bastos also accepted investor funds into his personal cryptocurrency accounts, orchestrating a deliberate scheme with CFT agents:

- New Jersey investors and Plaintiffs transferred funds to their agents' personal accounts. Israel himself used the same method, with El acting as his agent (Exhibit 17 – Transfer of NJ Investors' and Roman's Funds to El's Personal Account).
- These agents then conducted "internal transfers" on the FxWinning platform (Exhibit 18 – Internal Transfers Made by El and Percy), funneling the true funds into Bastos's personal crypto wallets (Exhibit 19 – El Transfers Investors' Funds to Bastos).

This coordinated system of fund transfers concealed the true nature of transactions and facilitated the misappropriation of investor funds. Evidence further shows that Bastos suggested this method to multiple agents.

88.    Bastos's conduct— participation in NJ-attended events, collaboration with key CFT agents, and misappropriation of NJ investors' funds—establishes sufficient minimum contacts with New Jersey under *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). His actions were deliberate, systematic, and purposefully directed at New Jersey, warranting this Court's jurisdiction.

**Jurisdiction over CFT's COO, Percy**

89.    Percy's participation in CFT's Bahamas convention from December 9-12, 2022, highlights his connection to New Jersey. During this event, Percy, alongside CFT leadership, including the CEO and Israel, discussed CFT's achievements and reaffirmed their leadership roles. This convention was attended by New Jersey investors invited by CFT, who were influenced by Percy's statements and those of other leaders (Exhibit 20 – Texts from Kayla Van Boven, Canadian CFT Agent, to Plaintiff Elsisi).

90.    As a key figure in fraudulent activities linked to New Jersey, Percy provided contacts for Alexandro Enrique Garcia Lopez, who created fake Panamanian corporations for investors, including those from New Jersey. His business partner, Adelangela Fumagalli, and daughter, Sarah Percy, acting as part of CFT's "onboarding team," were directly involved, further linking him to the fraudulent operations targeting New Jersey residents (Exhibit 21 – Emails from Percy to Mr. Garcia).

91.    Percy's role in creating fraudulent corporations extended beyond a single instance. Investors connected to him sought similar fake Panamanian corporations through Garcia, based on recommendations from CFT-associated brokers. The Panama

registry later confirmed these corporations were fraudulent, directly impacting New Jersey investors.

92.    Percy was described by Bastos as "the glue of CFT," underscoring his integral role in its operations. His management of risk and close association with FxWinning leaders, including a meeting with FxWinning's CEO in Dubai in June 2023, highlight his pivotal position within the scheme. Percy's assertions of verifying investors' funds lent an appearance of legitimacy that misled New Jersey investors. Furthermore, Percy claimed to have provided this information to the attorneys, apparently the Mullins Law Firm (Exhibit 22 – Percy Stating Seeing Investors' Funds at LP Site).

93.    Percy actively engaged with New Jersey investors through Live/Zoom meetings, social media interactions, and monitor investor feedback on Telegram channels. His involvement included direct communication with New Jersey plaintiffs, demonstrating his intentional and purposeful connection to the state (Exhibit 23 – Percy Interacting with Plaintiff Elsisi and on social media).

94.    Percy's deliberate actions, including engaging with New Jersey investors and facilitating fraudulent activities, such as orchestrating the creation of a fake corporation for a New Jersey investor—even if that investor was an alleged family member—satisfy New Jersey's long-arm statute and federal due process requirements. These actions caused significant harm to New Jersey investors, establishing a substantial connection to the state and justifying the exercise of personal jurisdiction in this forum (Exhibit 24 – NJ Investor Recruited by Percy and Team).

**Jurisdiction over Israel**

95.    Defendant Israel's substantial and purposeful activities directed at Plaintiffs, as well as his integral role in the fraudulent scheme at issue, establish a strong

basis for personal jurisdiction in New Jersey. As a co-founder of the trading software used by CFT Solutions to manage investors' funds on FxWinning, Israel played a pivotal role in orchestrating and executing the fraudulent activities underlying this litigation. Notably, Israel (Vince Lajan) publicly claimed ownership of the software in an instructional video he created specifically for U.S. investors, including those in New Jersey. This video, posted on YouTube and later removed in 2024, further underscores his direct involvement in promoting the scheme. However, Plaintiff Roman recorded the video in 2023, preserving evidence of its content. Investors recruited by Israel watched this video when signing up, reinforcing his direct engagement in the fraudulent scheme (Israel Stating He Owns the Software Minute Mark 5:49 - https://drive.google.com/file/d/14M7_YQAnw_KkEvy5iq93ONOtfT46tZaa/view?usp=drive_link)



96.    Israel acted as an agent for Plaintiffs Nicasio and Pack, actively engaging in fraudulent activities targeting investors within this jurisdiction. Through his extensive

presence on social media platforms, particularly Facebook, Israel cultivated a substantial following and directly recruited investors, including residents of New Jersey. His targeted solicitation included posts falsely claiming that the entry fee for the investment program was about to increase or that participation would soon be limited to high-net-worth individuals, creating a sense of urgency to attract more investors. Additionally, Israel facilitated the creation of fake Haitian corporations, used to perpetuate the fraudulent scheme and deceive investors in New Jersey (Exhibit 25 – Israel Announcing Upcoming Increase in Minimum Deposit).

97.     Israel's use of his private plane for local and international travel to deliver motivational speeches about investing further demonstrates his active role in marketing the fraudulent scheme. During these speeches, Israel prominently promoted CFT's software and the investment program, reinforcing his pivotal involvement in sustaining the fraud (Exhibit 26 – Israel Holding Symposiums). His strong and deliberate presence on Facebook significantly influenced New Jersey investors, including Plaintiffs Nicasio and Pack, who were directly solicited by him. Other Plaintiffs, such as Masters, Springfield and Lewis, also followed and engaged with his social media posts, which were key in their decision to invest. Marshall, Israel's sub-agent, often answered to plaintiffs or commented on Israel's page (Exhibit 27 – Masters, Lewis, Springfield, Marshall Interacting on Israel's Page).

98.     Israel's prior involvement in fraudulent activities, including an Amazon drop-shipping (Vince Ecom Empire) scam that led to four class action lawsuits, evidences a pattern of deceit and dishonesty (Exhibit 28 – Israel's Lawsuits on Drop-shipping). His role in creating fake Haitian corporations for investors, including Plaintiffs Lewis and Nicasio, further illustrates his active participation in orchestrating fraudulent schemes with direct impact on New Jersey investors (Exhibit 29 – Fake Haitian Corporations for

Lewis and Nicasio). This history underscores Israel's deliberate actions to exploit Plaintiffs and others through calculated and deceitful practices.

**Jurisdiction over EL**

99.    EL played a central role in the fraudulent scheme, acting as an agent for New Jersey investors and deliberately targeting residents of the state to further the defendants' fraudulent enterprise. Specifically, EL engaged directly with at least two New Jersey investors who are not parties to this lawsuit (Nerva Louis and Hasana Woods), facilitating their involvement in the scheme and establishing his purposeful contacts with New Jersey (Exhibit 30 – Confirmation of El as Agent for NJ Investors Nevis Louis and Hasana Woods).

100.    EL's actions extended beyond mere facilitation; he set up a fraudulent Panamanian corporation for one of the New Jersey investors, Hasana Woods, and directly communicated with Mr. Garcia to produce fake documents, demonstrating his active and intentional participation in the fraud with clear effects felt within New Jersey. These actions were deliberately aimed at exploiting New Jersey residents' trust and resources, satisfying the "purposeful availment" standard required for personal jurisdiction (Exhibit 31 – Email to Mr. Garcia and El).

101.    The fraudulent conduct involved the direct wiring of funds from the New Jersey investors to EL. Rather than managing these investments as promised, EL funneled the funds into private cryptocurrency wallets belonging to Bastos, the CEO of CFT, further evidencing his deliberate actions to misappropriate funds from New Jersey residents and link his fraudulent activities to the state.



102.    EL's current 10-year prison sentence in Mississippi for fraud and forgery underscores a pattern of fraudulent behavior directly relevant to this case. His use of forged documents to deceive plaintiffs and other investors reflects his prior criminal actions, reinforcing his role in the fraudulent scheme and the foreseeability of being haled into court in New Jersey due to his targeted actions in the state (Exhibit 32 – El's Verdict).

103.    EL's misappropriation of funds and creation of fake documents caused direct harm to New Jersey investors, demonstrating the significant effects of his conduct within the state. This establishes a strong nexus between EL's actions and New Jersey, fulfilling the requirements for personal jurisdiction under the effects test. His fraudulent activities, tied to both his past convictions and his current role in the scheme, create a clear basis for the exercise of jurisdiction over him in New Jersey.

## Jurisdiction over Jex, Santana, and Marshall

104.    Jex and Santana, both agents of CFT, were directly involved in representing and facilitating transactions for most of the New Jersey plaintiffs. Their active roles in managing and processing investor funds from New Jersey, coupled with their representation of these plaintiffs, establish substantial connections to the state.

105.    The fact that Jex and Santana have defaulted in answering the summons further signifies their acknowledgment of, and acquiescence to, the jurisdictional authority of this Court. Their failure to contest the jurisdiction underscores the appropriateness of asserting personal jurisdiction over them in New Jersey, given their purposeful and systematic engagement with New Jersey residents and the nature of their involvement in the fraudulent scheme.

106.    Marshall, a sub-agent closely connected to Israel, is under the New Jersey court's jurisdiction. His failure to respond to the summons implies he recognizes the court's authority over him. This default strengthens the court's ability to handle claims related to his significant role in the scheme.

107.    The intentional fraudulent activities by Defendants CFT, Bastos, Percy, Israel, El, Jex, and Santana were expressly aimed at NJ, causing harm to NJ residents. Under *Calder v. Jones*, this creates a sufficient basis for NJ to assert jurisdiction, as the defendants knew their fraudulent schemes would have substantial effects in NJ.

## Case Law

108. In *Hanson v. Denckla*, 357 U.S. 235 (1958), the Court stated that it is essential that the defendant "purposefully avail" themselves of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.

109.    Under *Calder v. Jones*, 465 U.S. 783 (1984), the Court held that personal jurisdiction can be established if the defendant's intentional actions are expressly aimed

at the forum state, causing harm that the defendant knows is likely to be suffered in the forum state.

110.    The Supreme Court in *International Shoe Co. v.Washington*, 326 U.S. 310 (1945), established that for a court to exercise personal jurisdiction over a non-resident defendant, the defendant must have "minimum contacts" with the forum state such that maintaining the lawsuit does not offend "traditional notions of fair play and substantial justice."

## FACTUAL ALLEGATIONS

111.    CFT, working with FxWinning, promoted an appealing investment in Forex automated trading. They claimed to have a special algorithm for high-frequency trading with minimal error, promising big and secure returns (Exhibit 33 – CFT's Endorsement and Attestation of the Trading Software). Israel, co-founder of the software, backed this algorithm by comparing its strategy to that of major banks, which allegedly use similar methods to make large profits from clients' money while offering only small interest returns. This endorsement aimed to boost the investment's credibility and persuade investors of its potential for high profits (Exhibit 34 – Israel Comparing the Software with Bigger Banks). Bastos himself discussed the software's performance during an audio conference with all the agents, even after withdrawals had stopped, as the software apparently continued trading on FxWinning's platform until nearly the end of June 2023.



112.    The Individual Defendants lured Plaintiffs with promises of guaranteed monthly profits ranging from 15% to 20%, splitting these returns with CFT through a Three-Way Limited Power of Attorney Agreement, with a split of 40/60 or 50/50 (Exhibit 35 – LPOAs Showing CFT's Commission).

113.    To reinforce the illusion of credibility, the Limited Power of Attorney (LPOA) stated that it would become effective only after the Firm, FxWinning, had successfully completed KYC (Know Your Customer) and AML (Anti-Money Laundering) verifications. However, the Plaintiffs later discovered that no such verifications were conducted (Exhibit 36 – LPOA Clause on KYC and AML Conditions).

114.    To attract high-liquidity investors from the USA while avoiding legal issues, CFT and FxWinning employed a deceptive approach. Publicly, they claimed they did not accept investors from North America and other certain countries, but privately, they came up with options to include these investors as well (Exhibit 14). Initially, CFT facilitated this by creating fake Jamaican IDs for investors (Exhibit 37 – Fake Jamaican ID for USA

Investor). Later, CFT's agents registered investors as if they were from the U.S. Virgin Islands, rather than the mainland USA. For example, El and Santana personally signed up Szabo and Marquez using the U.S. Virgin Islands as their location, despite loading their original U.S. IDs.

115.    If FxWinning truly did not accept North American investors, it should have detected any attempts to circumvent this policy. The agents were well aware of both companies' rules, and CFT frequently emphasized that investors could not evade the broker's scrutiny, as FxWinning had a history of identifying any investor who modified the Limited Power of Attorney (LPOA) (Exhibit 38 – CFT's Communications on Official Telegram Channel). Furthermore, the LPOA contained the investor's address, and many investors were signed up using their USA ID.

116.    To overcome the challenges of using fake identities, CFT and FxWinning used a more sophisticated method: setting up offshore corporations. This tactic was proposed by Merino, the CEO of FxWinning, and carried out by Bastos, the CEO of CFT (Exhibit 39 – Merino Proposing Offshore Corporations). These fake entities, which cost between $500 and $1,500, were designed to look real and mislead investors into believing they were legitimate. CFT used their connections to create these entirely fraudulent corporations to intimidate investors and make them think that taking legal action would be blocked by these fake companies (Exhibit 40 – Plaintiffs' Payments for Offshore Corporations).

117.    CFT implemented a "red flag" policy to control liquidity and obscure fraudulent activities, penalizing investors who attempted significant withdrawals. Investors withdrawing over 50% of their profits faced restrictions, while those attempting to withdraw 90% or more risked complete exclusion (Exhibit 41 – Red Flag Investors List). These policies effectively trapped investors and deterred scrutiny of the operation's true nature. For instance, Szabo was flagged with a "yellow flag" after his withdrawals

exceeded the established threshold (Exhibit 42 – Yellow Flag for Szabo). Bastos mentioned the red flag long after withdrawals had already stopped during a remote meeting with his agents.



118.    The turning point came in November 2022, when Defendants began implementing measures to legitimize their operation. Percy used his political connections to recruit high-ranking government officials to the board of CFT and invited them to a convention in the Bahamas in December 2022. During the convention, Percy and Bastos reassured investors of the scheme's credibility (Exhibit 43 – Percy's Political Influence).

119.    They also engaged a reputable liquidity provider, B2Broker, in a bid to bolster the operation's legitimacy. However, these steps backfired. B2Broker, bound by strict regulatory standards, initiated Know Your Customer (KYC) and Anti-Money Laundering (AML) verifications in early 2023.

120.    In January 2023, to satisfy B2Broker's demands, Defendants presented a forged letter purportedly from KPMG Spain, falsely claiming the validation of their HFT software (Exhibit 44 - KPMG Letter & Bastos' Endorsement). KPMG later confirmed that the letter was fraudulent, exposing that Defendants lacked any legitimate trading software (Exhibit 45 – KPMG's Denial of Involvement with CFT).

121.    As B2Broker proceeded with its verifications, it likely identified significant irregularities. Many North American investors, including most of the Plaintiffs, had been onboarded using fake documents and information, or nonexistent offshore corporations. These irregularities have likely led B2Broker to freeze withdrawals, leaving investors unable to access their funds.

122.    Brito, the CEO of FxWinning, testified under oath during a deposition in the case *CFT Solutions v. FxWinning* that B2Broker was in possession of the investors' funds (Exhibit 46 – Brito Stating B2Broker has the Investors' Funds). In December 2022, CFT further claimed on their Telegram channel that the investors' funds had been converted to fiat currency and deposited with the liquidity provider (LP), identified as B2Broker (Exhibit 47 – CFT Stating Funds are Sent to LP). However, when contacted by the Plaintiffs, B2Broker denied this allegation (Exhibit 48 – Emails from B2Broker Denying Holding Funds). Adding to the conflicting narratives, Percy asserted that he had personally seen the investors' funds at the liquidity provider's site in May/June 2023, allegedly B2Broker (Exhibit 22). Meanwhile, Bastos attributed the retention of the funds to FxWinning, which led to a lawsuit filed against the broker in May 2023.

123.    By March 2023, FxWinning completely ceased withdrawals, citing KYC and AML verification requirements. Bastos, who controlled key communications at FxWinning site, produced significant content that misled investors into believing the issues were temporary. Despite these reassurances, no withdrawals were processed, and Plaintiffs' funds remained inaccessible.

124.    Israel set up his investors with offshore Haitian corporations to better meet KYC and AML requirements. Among those who received these corporations were Nicasio and Lewis, but these entities were ultimately fake. Israel used his connections in Haiti to create these corporations, purportedly to help the investors access their funds.

125.    While KYC and AML verifications were in progress, in May 2023, CFT filed a lawsuit against FxWinning, accusing it officially of breach of contract, to lately amend it and add fraud and money laundering. Plaintiffs contend this lawsuit was a smokescreen designed to deflect legal actions against CFT and buy time to address the frozen withdrawals. El, privy to internal operations, stated that the lawsuit was merely a distraction, as the broker, FxWinning, did not have the money (Exhibit 49 – El's Admission: FxWinning Lacked Investors' Funds).

126.    Percy traveled to London to meet with Lloyds of London regarding obtaining insurance, while Bastos and Israel simultaneously went to Dubai to confer with Brito, the CEO of FxWinning, on the same insurance matter. These coordinated actions underscore their ownership interest in FxWinning, as they exceed the responsibilities of merely being software providers (Exhibit 3).

127.    Plaintiffs' funds, funneled through CFT agents, were frequently subjected to "internal transfers," creating a clear trail of misappropriated money leading to Bastos's private accounts. Roman transferred funds to El's private account, after which El performed an "internal transfer" from his FxWinning account to Roman (Exhibit 17 and 18). Subsequently, El provided Roman with text messages revealing that the original funds had been transferred to Bastos's personal cryptocurrency accounts (Exhibit 19). This evidence strongly suggests that all agents who employed this method ultimately sent investors' funds to Bastos as well.

128.    By mid-2023, FxWinning had approved the Plaintiffs' KYC applications; however, withdrawals continued to be denied. Plaintiffs, initially unaware that their documents were illegitimate, complied with the verification requests but later began to question the validity of these approvals. They believe that many of FxWinning's investors failed the KYC verifications, as it would be impossible for fake documents, information, and corporations to withstand such scrutiny (Exhibit 50 – Approvals Received by the Plaintiffs).

129.    By late August 2023, FxWinning shut down operations, and CFT ceased its activities shortly thereafter. The delay by CFT in disclosing its litigation against FxWinning until late July 2023 highlights a clear intent to mislead investors and evade accountability (Exhibit 51 – CFT Announcing the Lawsuit). This delay also suggests that CFT and FxWinning likely believed they could pass the validation process and resume their activities. This is evidenced by a Zoom meeting held by Bastos and Percy with all agents, during which they discussed future plans, including the introduction of new software for Forex and cryptocurrency trading (Exhibit 52 – Bastos Briefs Agents on New Software.                                                                                             -https://drive.google.com/file/d/1OYWDYaHscgDIjzM81jHLCNi_BUiYRQfU/view?usp=drive_link ).



130.    CFT retained a reputable law firm to represent Bastos and Percy in many cases, including the current one, while FxWinning could not afford to pay for the servers where CFT's investors documents were stored, and they even lost their legal representation due to unpaid legal fees (Exhibit 53 – Brito's Admission: FxWinning's Financial Struggles). FxWinning recently defaulted in the case *CFT Solutions v. FxWinning* leaving the Plaintiffs wondering who truly is in possession of the investors' funds.

131.    The tightly woven relationship between FxWinning and CFT revealed coordinated efforts to execute the fraudulent scheme. From introducing a regulated liquidity provider to implementing extensive KYC measures, their actions highlighted a shared strategy to bolster investor confidence while concealing the scheme's true nature. Promotional materials claiming independence between the entities were contradicted by their close operational collaboration.

### The New Jersey Plaintiffs and Defendants Jex, Santana, and Israel

132.    The New Jersey Plaintiffs are Khaled Elsisi, Najy Kanan, Ahmed Khder, Ricardo Marquez, Luis Pinos, Ahmed Sharafeldin, Linwood Walker, Barry Rosner, Juan Nicasio, Aliqwan Pack and Robert Yeng, all residents of New Jersey.

133.    Upon information and belief, Jex served as CFT' agent to New Jersey Plaintiffs Elsisi, Kanan, Khder, Pinos, and Sharafeldin, receiving commissions on each of their accounts.

134.    Upon information and belief, Israel served as CFT agent to New Jersey Plaintiffs Pack and Nicasio receiving commissions of their accounts.

135.    Santana acted as Jex's representative or sub-agent, handling communications between some of the New Jersy Plaintiffs and Jex.

136.    Santana facilitated connections between the New Jersey Plaintiffs—except Marquez, Pack, and Nicasio—and Dominic Peterkin of Jamaica to create offshore

corporations in Jamaica, supposedly to be used for opening their accounts.

137.    Israel facilitated connections between Nicasio, and a Haitian entity known to him, purportedly to create an offshore corporation that would be used to withdraw funds after withdrawals had ceased.

138.    Elsisi and Pinos paid $500 each to Peterkin for the creation of these Jamaican corporations. Plaintiffs Kanan, Khder, Rosner, Sharafeldin, Walker, and Yeng paid $500 to Santana for Peterkin's services.

139.    Nicasio paid $1500 to the Haitian entity for their services, while Israel covered the cost for Pack.

140.    FXWinning stopped the withdrawals in 2023, it was discovered that the purported Jamaican corporate documentation had never been filed, and no such corporations existed for the New Jersey Plaintiffs. The Companies Office of Jamaica confirmed that the Plaintiffs' corporation certificates are not valid incorporated entities (Exhibit 54 – Jamaican Authorities Verify Nonexistence of Claimed Corporations).

141.    Throughout their communications, Santana assured the New Jersey Plaintiffs that their investments would be highly profitable and that their funds were secure.

142.    The net unreturned deposits and last known balances for the New Jersey Plaintiffs are as follows:

| Plaintiff | Net Investment | Last Balance |
|---|---|---|
| Elsisi | $97,000.00 | $151,937.48 |
| Kanan | $117,000.00 | $153,969.00 |
| Khder | $64,965.00 | $91,658.00 |
| Marquez | $87,000.00 | $132,000.00 |
| Pinos | $124,906.52 | $168,999.00 |
| Rosner | $50,000.00 | $84,645.40 |

| | | |
|---|---|---|
| *Sharafeldin* | $50,100.00 | $72,005.41 |
| *Walker* | $217,000.00 | $289,935.00 |
| *Yeng* | $50,000.00 | $78,945.09 |
| *Nicasio* | $60,000.00 | $54,707.61 |
| *Pack* | $20,536,58 | $54,759.80 |
| *Total* | $938,508.10 | $1,333,561.79 |

**Plaintiffs Roman, Szabo and Lewis and Defendants Bastos, EL, Percy and Israel**

143.    Facebook posts by Israel promoting the profitability of FX trading with specific software were instrumental in persuading Lewis, Szabo, and Roman to open accounts and invest through CFT into FxWinning.

144.    Marshall, on behalf of Israel, guided Lewis through the onboarding process, while EL served as the CFT agent responsible for onboarding Roman and Szabo.

145.    Upon information and belief, both Israel and EL received a 10% commission on the income purportedly generated in the accounts of the investors they recruited. EL directed Roman to contact Alexander Enrique Garcia Lopez to establish a Panamanian corporation for investment purposes.

146.    Mr. Garcia, believed to be an investor of Defendant Percy, CFT's COO, charged Roman over $1,500 for the creation of the Panamanian corporation. However, like other CFT agents, Mr. Garcia only provided counterfeit documents, which EL later uploaded to the FXWinning website. Roman discovered this fraud in July 2023, after FXWinning had already ceased operations.

147.    Roman later confirmed with the Panama registry that her corporation was fake (Exhibit 55 – Panama Registry Verified Nonexistence of Claimed Corporation).

148.    Roman initially deposited her funds into FxWinning through her son Szabo's account since she didn't have her own cryptocurrency account. When she planned to make a larger deposit of over $118,000, EL instructed her to wire the money directly to his personal account.

149.    EL later informed Roman that he had transferred the funds to her FXWinning account after deducting a $2,326 transfer fee, which he didn't explain. Roman eventually found out that EL had conducted an internal transfer on the FxWinning platform from his account to hers, leading her to suspect that her actual funds had been deposited into Bastos's crypto wallets.

150.    During her investigation into the loss of her funds, Roman received text messages from EL revealing that CFT investors' funds, initially held in his personal account, were subsequently transferred to Bastos's crypto wallets. The texts indicated that over $600,000 had been moved within just one week. Upon information and belief, these funds were retained by Bastos (Exhibit 19).

151.    The net unreturned deposits of plaintiffs Roman, Szabo and Lewis are as follows:

|  | Net Investment not returned | Last Balance |
|---|---|---|
| Lewis | $80,785.09 | $258,346.94 |
| Roman | $176,407.40 | $246,120.94 |
| Szabo | $105,318.07 | $273,000.00 |
| Total | $362,510.56 | $777,467.88 |

**Plaintiffs Masters and Springfield and Defendants Marshall and Israel**

152.    Israel's Facebook posts, which highlighted the profitability of trading through a specific software, played a significant role in convincing Masters and Springfield to invest, similar to other Plaintiffs.

153.    Upon information and belief, Marshall frequently contributed to Israel's Facebook posts, supporting his promotions of the software, further influencing potential investors (Exhibit 56 – Marshall's Communications on Social Media).

154.    Despite having her own account, Marshall instructed Masters to use Alexander Enrique Garcia Lopez to establish a corporation in Panama. This arrangement was intended to enable her to open an offshore account and secure a master account, the specifics of which neither Masters nor any other Plaintiffs were aware of.

155.    Garcia charged her $1,500 for the service, but, as with other Plaintiffs, he merely produced forged documents that falsely represented the existence of an offshore corporation and uploaded them to the FXWinning website. Later, Garcia demanded an additional $1,280 for supposedly "updated" corporate filings.

156.    Masters later confirmed with the Panama registry that her corporation was fake (Exhibit 57 – Panama Registry Verified Nonexistence of Claimed Corporation).

|  | *Net Investment not returned* | *Last Balance* |
|---|---|---|
| *Masters Corp Acct Super.* | $59,000.00 | $89,222.55 |
| *Masters personal Acct* | $78,705.00 | $123,088.06 |
| *Springfield* | $48,000.00 | $65,782.95 |
| *Total* | $185,705.00 | $278,093.56 |

## COUNT I

## RICO § 1962(c)

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This Count is against All Defendants named in this Complaint.

157.    The Defendants, individually and collectively, conducted and participated in the affairs of an enterprise, as defined by 18 U.S.C. § 1961(4), through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

### A. The Enterprise

158.    The enterprise in this case is a group of individuals and entities that functioned as an ongoing organization, engaging in coordinated activities with a common purpose: to defraud investors through a fraudulent forex investment scheme involving CFT and its associates. The enterprise was composed of the following participants:

- o **CFT Corporation (Enterprise Entity)**: CFT orchestrated the fraudulent scheme, promoting its trading software as a lucrative investment tool while concealing its true operations. It engaged in deceptive practices such as fabricating offshore corporations, manipulating trades, and misappropriating investor funds. Mandating FxWinning as the exclusive broker, CFT falsely claimed its services were non-securities, despite evidence to the contrary. The scheme was extensive, leveraging intricate layers of deception to defraud investors across multiple jurisdictions.

- o **CEO of CFT (Key Decision-Maker and Leader)**: CEO Bastos orchestrated the enterprise's multi-jurisdictional fraud, personally accepting investor funds into his cryptocurrency accounts and managing operations via official channels like Telegram. He coordinated live Zoom meetings, social gatherings, and conventions

attended by investors, agents, and the CFT board, exemplifying the coordinated and systematic nature of the fraudulent scheme and its pattern of racketeering activity.

o **COO of CFT (Risk Manager and Facilitator)**: The COO, Percy, played a pivotal role in managing the enterprise's risk, maintaining close ties with FxWinning's leaders, and facilitating the creation of fake Panamanian corporations through an associate. He actively promoted the fraudulent scheme at global business conventions and leveraged his political connections to recruit high-ranking officials to CFT's board, creating a false sense of security among investors and advancing the enterprise's deceptive practices.

o **FxWinning (Collaborating Broker)**: FxWinning, the broker central to the enterprise's fraudulent trading activities, manipulated trading records, halted withdrawals, and ultimately shut down, leaving investors with significant unreturned deposits. Closely tied to Bastos and Percy, FxWinning facilitated the scheme. Plaintiffs believe FxWinning lacks the investors' funds, as CFT repeatedly cited liquidity providers. In June 2023, Percy claimed to have seen the funds at the liquidity provider's site, a claim the provider denied. CFT stated that funds were converted to fiat and sent to the provider, while El, referring to CFT's lawsuit against FxWinning, claimed that the broker did not hold the investors' money.

o **Agents and Sub-Agents (Recruiters and Facilitators)**: Various agents, including Jex, Santana, Marshall, EL, and Israel, played key roles in executing the fraud by recruiting investors and orchestrating deceptive operations. They connected investors with offshore entities, facilitated Three-Way Agreements that bound them to the enterprise, and created fake documents and corporations to fabricate legitimacy. To expand the scheme across multiple jurisdictions, these agents relied on sub-agents who were not on CFT or FxWinning's payroll—Israel

utilized Marshall, Jex worked with Santana, and Percy engaged his business partner, Adelangela Fumagalli, and his daughter, Sarah Percy.

o **Offshore Corporations (Fraudulent Entities)**: The enterprise used offshore corporations, purportedly created in Jamaica, Haiti, Panama, and other locations, to give the appearance of legitimate business operations. These corporations were, in fact, fabricated, and their sole purpose was to deceive investors and provide a legal shield for the enterprise's fraudulent activities, while preventing investors from seeking legal action against the Defendants.

o **Social Media Influencers (Promoters and Deceptive Marketers)**: Individuals like Israel leveraged social media platforms, particularly Facebook, to promote the enterprise's investment scheme by posting motivational content, flaunting his wealth, and making false claims about the scheme's profitability, thereby attracting significant investments (Exhibit 58 – Israel's Posts on Facebook). Meanwhile, Bastos and El recruited new investors at car meets, where they showcased luxury vehicles (Exhibit 59 – Bastos and El at Car Meets). At the same time, CFT utilized Telegram to emphasize the purported profitability of their software, the legality of FxWinning, and vague references to liquidity providers, deliberately avoiding specific names (Exhibit 60 – CFT's Communications on Telegram).

## B. Pattern of Racketeering Activity

### Grand Theft – Pursuant to 18 U.S.C. § 1961 (c)

159.    Pursuant to 18 U.S.C. § 1962(c), the Defendants have engaged in a pattern of racketeering activity through the commission of multiple acts of grand theft, as defined under 18 U.S.C. § 1961(1)(A) and applicable state laws.

160.    The Defendants, individually and collectively, have engaged in grand theft by unlawfully taking and misappropriating the Plaintiffs' funds with the intent to permanently deprive them of their property. Specifically:

o  **Misappropriation of Funds:** The Defendants, through fraudulent representations and omissions, induced the Plaintiffs to invest substantial sums of money into a purported forex trading scheme. These funds were then transferred to accounts controlled by the Defendants, who failed to return the principal amounts or any purported profits, thereby permanently depriving the Plaintiffs of their funds.

o  **Fraudulent Creation of Offshore Corporations:** The Defendants facilitated the creation of fake offshore corporations in Jamaica, Haiti, and Panama, charging Plaintiffs fees for these non-existent entities. The funds paid by Plaintiffs for these fraudulent services were never returned, constituting grand theft. The New Jersey Plaintiffs were associated with a Jamaican corporation, Nicasio and Lewis with a Haitian corporation, and Roman and Masters with a Panamanian corporation.

o  **False Representations and Deception:** The Defendants falsely represented the safety, profitability, and legitimacy of the investment scheme, knowing that the scheme was fraudulent and that the Plaintiffs' funds would be misappropriated for the Defendants' personal use.

o  **Continuity and Relatedness:** These acts of grand theft are related to each other and to the Defendants' overall scheme to defraud investors. They share the same purpose, results, participants, victims, and methods of commission. The acts were not isolated incidents but part of a continuous pattern of criminal behavior, designed to enrich the Defendants at the expense of the Plaintiffs and others similarly situated.

161.    This pattern of racketeering activity, including multiple acts of grand theft, constitutes a violation of the RICO Act, and the Plaintiffs are entitled to relief under 18 U.S.C. § 1964(c).

## **Communication Fraud - Pursuant to 18 U.S.C. § 1961(1) and (5)**

- o **18 U.S.C. § 1961(1)** defines "racketeering activity" to include various criminal offenses, including wire fraud (18 U.S.C. § 1343) and mail fraud (18 U.S.C. § 1341).

- o **18 U.S.C. § 1961(5)** defines a "pattern of racketeering activity" as requiring at least two acts of racketeering activity within a ten-year period.

162.    The Plaintiffs allege that the Defendants engaged in a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq. Specifically, the Defendants committed multiple acts of wire fraud (18 U.S.C. § 1343) through interstate communications designed to defraud the Plaintiffs of their investments. These fraudulent communications were conducted via electronic means, including, but not limited to:

- o **Telegram Communications:** Defendants utilized the Telegram messaging platform to solicit investments from the Plaintiffs. The Defendants provided misleading information about the profitability and safety of the investments, inducing the Plaintiffs to invest substantial amounts of money. These communications included regular updates, investment advice, and reassurances of the legitimacy of the investment scheme, which were transmitted across state, national, and international lines.

- o **Emails and Electronic Correspondence:** The Defendants also engaged in a pattern of sending fraudulent emails and other electronic communications to the Plaintiffs. These communications contained false representations about the

existence of offshore corporations, the management of funds, and the returns on investments. These fraudulent misrepresentations were made with the intent to deceive the Plaintiffs and to induce them to continue investing in the scheme.

o **Social Media and Online Platforms:** Defendants utilized social media platforms, including Facebook, to disseminate false and misleading information about the investment scheme. The Defendants posted content that falsely portrayed the success and legitimacy of the scheme, thereby luring the Plaintiffs into making additional investments. Plaintiffs Nicasio, Pack, and Lewis for instance, were influenced to join the scheme after years of following Defendant Israel's online posts.

o **Live/Zoom Meetings and Business Conventions:** Defendants hosted and participated in live meetings and Zoom conferences, during which they made fraudulent statements to the Plaintiffs. These meetings were conducted across state lines and included New Jersey-based investors. During these events, the Defendants reiterated their fraudulent claims, reinforcing the false belief that the investments were secure and profitable.

163.   These acts of wire fraud, conducted through various channels of interstate communication, form a "pattern of racketeering activity" as defined under 18 U.S.C. § 1961(5). The Defendants' fraudulent communications were not isolated incidents but rather part of a continuous and ongoing scheme to defraud the Plaintiffs over an extended period. The Defendants' actions demonstrate a concerted effort to deceive the Plaintiffs, causing them significant financial harm.

## **Money Laundering**

164.   **18 U.S.C. § 1961(1)(B)** defines "racketeering activity" as including "any act which is indictable under... Section 1956 (relating to laundering of monetary instruments) or Section 1957 (relating to engaging in monetary transactions in property

derived from criminal activity)." In the context of this case, the Plaintiffs allege that Defendants engaged in a pattern of racketeering activity through a series of related money laundering offenses.

**Money Laundering Activities** – Pursuant to 18 U.S.C. § 1956

- o **Transactions to Promote Unlawful Activity**: Defendants conducted transactions designed to further the ongoing criminal enterprise. This involved transferring funds between various accounts and creating false documents to facilitate these transactions, thereby furthering the fraudulent scheme and disguising the true nature of their business operations.

- o **Use of Financial Institutions**: Defendants used financial institutions, both domestic and international, to process and legitimize illicit funds. They established accounts in the names of offshore entities, which were actually fraudulent, to receive and launder investor funds. This misuse of financial institutions is indicative of the systemic nature of their money laundering activities.

- o **Failure to Comply with KYC and AML Regulations**: FxWinning operated without conducting Know Your Customer (KYC) or Anti-Money Laundering (AML) verification on its investors. This lack of regulatory adherence raises serious concerns about the legitimacy of their operations. According to the Three-Way Agreement, which was obtained by CFT, the Limited Power of Attorney (LPOA) was contingent upon FxWinning's formal approval of the investor and compliance with all necessary procedures, including KYC and AML requirements. The failure to execute these procedures highlights a deliberate evasion of regulatory scrutiny.

- o **Creation of Fake Documents and Offshore Corporations:** CFT agents were responsible for creating fake IDs and offshore corporations to recruit investors from countries not accepted by FxWinning. These fabricated documents were used to bypass regulatory restrictions and facilitate the recruitment of investors under false pretenses. The fraudulent nature of these documents

underscores a systemic effort to obscure the true identity of the investors and their sources of funds.

o **Failure to Pass Verification Procedures**: When the new liquidity provider, B2Broker, initiated verification procedures, FxWinning failed to meet the requirements, resulting in the revocation of their MT5 license, even if the CEO invoked other reasons, leading to the closure of FxWinning (Exhibit 61 – Brito Confirms Revocation of MT5 License).

o **Misleading Promises and Investor Deception:** FxWinning falsely promised investors a return of their investments with interest within 15 business days, fully aware that such promises were unrealistic and would likely attract scrutiny from financial institutions and law enforcement (Exhibit 62 – Plaintiffs Approval for Withdrawal). Faced with the impossibility of returning funds, FxWinning requested investors to resubmit their sign-up documents, knowing that many of these documents were based on fake identities or fake offshore corporations. This action was a clear attempt to delay and obstruct the return of funds (Exhibit 63 – FxWinning's Request for Document Resubmission).

o **Demonstration of Money Laundering Activities**: The combination of false promises, fake documents, and the lack of genuine Forex trading activities points to significant money laundering operations by both CFT and FxWinning. Their claims of secure returns of 15-20% on investments, with 40%-50% allocated to CFT, were unrealistic and indicative of fraudulent practices. Over three years, despite a volatile market, the software purportedly never lost money, a claim that defies market logic and suggests manipulation (Exhibit 64 – CFT's Positive Market Claims Amid Negative Trends).

o **Litigation and Blame Shifting**: Subsequently, CFT sued FxWinning for the loss of funds, with both parties shifting blame to the liquidity provider. The liquidity provider, a reputable firm, denied holding any of the investors' money. This

litigation appears to be part of a broader scheme to deflect responsibility and obscure the true nature of the money laundering activities conducted by CFT and FxWinning.

**Evidence of Money Laundering**

o **Transferring Funds to Personal Cryptocurrency Accounts**: The CEO of CFT directed investor funds into personal cryptocurrency accounts. This activity was part of a broader scheme to obscure the illicit nature of the funds and integrate them into the financial system.

o **Facilitating Offshore Transactions**: Defendants facilitated the creation of fake offshore corporations to further launder money. They provided forged documentation and misled investors into believing their funds were being invested in legitimate offshore entities.

o **Communicating and Coordinating Through Multiple Channels**: Defendants coordinated their money laundering efforts using various communication channels, including official Telegram channels and business conventions. This coordination was integral to maintaining the facade of legitimacy and continuing the fraudulent scheme.

o **False Profit Guarantees and Fraudulent Endorsements:** CFT promised investors secure, low-risk profits with guaranteed monthly returns of 15%-20%, to be split either 40/60 or 50/50. They claimed their trading software consistently generated profits, even during financial downturns. However, its legitimacy was highly questionable—Bastos forged a KPMG audit to falsely endorse the software's performance, while Israel later admitted that the software did not exist or was ineffective.

```
      297900 Israel Ivenson  12-14-2023      Page 50

 1   there's a lot.  I mean, I don't particularly use to many
 2   of them.  It's -- I mean, it's been years, like years
 3   and years, but there's sway markets, there's -- what's
 4   the other one's name?  The Hugo's ways, a bunch of them.
 5       Q.   So in theory, if the algorithm was effective,
 6   regardless of what happened with FXWinning, the
 7   algorithm could have been used with another broker?
 8       A.   I would say so, yes.
 9       Q.   But it hasn't, to your knowledge?
10       A.   To my knowledge, no.
```

165.    The pattern of racketeering activity is evident from the continuous and related nature of these money laundering activities. The fraudulent transactions were not isolated incidents but were part of a coordinated effort to launder illicit funds and perpetuate the fraudulent investment scheme. The ongoing and interconnected nature of these activities satisfies the requirement of a pattern of racketeering under **18 U.S.C. § 1961(5)**.

## **Monetary Transactions in Property Derived from Unlawful Activity – Pursuant to 18 U.S.C. § 1957**

166.    Under 18 U.S.C. § 1957, it is a criminal offense to engage in monetary transactions involving property derived from criminal activity, where the property is valued at $10,000 or more, and the transactions are conducted with knowledge that the property was derived from such unlawful activity. This provision is also applicable to civil cases involving racketeering, where plaintiffs can establish that defendants have engaged in financial transactions involving property obtained through racketeering activities.

167.    In accordance with 18 U.S.C. § 1957, the plaintiffs assert that the defendants in this case have engaged in monetary transactions involving property derived

from unlawful activities, directly linking them to racketeering under the RICO Act. Specifically:

- o **Bastos**: In 2022, Bastos acquired a property valued at approximately $15.5 million in North Miami Beach, which he subsequently sold in 2024. Additionally, Bastos spent over $1 million to celebrate his son's birthday at Mar-a-Lago in 2022 (Exhibit 65 – Bastos, COO, and Agents at Mar-a-Lago). All this besides possessing multiple luxury vehicles and a private plane. These transactions indicate the use of funds derived from unlawful activities for acquiring and enjoying high-value assets. Currently, Bastos is financing all litigations filed against CFT or involving CFT, including covering the legal fees for the entities on CFT's side.

- o **EL**: EL purchased a property in Plantation, Florida in 2022, under his husband's name, which he extensively remodeled and has been sold in 2024. This transaction reflects the use of illicitly obtained funds for acquiring and disposing of significant assets (Exhibit 66 – El's Property).

- o **Israel**: Israel's financial activities include the complete purchase and rebuilding of a property in Plantation, Florida in 2021, with landscaping costs alone amounting to six figures. In January 2022, Israel purchased a yacht valued at $40 million. Additionally, Israel utilized Forex as a personal bank to build a penthouse offshore in the Dominican Republic and acquire multiple other properties. He also has an extensive collection of luxury vehicles and a private plane. These expenditures demonstrate the use of funds derived from unlawful activities for personal enrichment (Exhibit 67 - Israel Used Forex as His Own Personal Bank).

- o **Marshall**: Marshall posted on Israel's Facebook page that his withdrawals during the scam recuperated all his lifetime losses and more. This information further evidences the fraudulent nature of the transactions, and the substantial financial gains realized by Marshall, which were derived from the illicit activities of the defendants (Exhibit 68 - Marshall's Admission of Profiting from the Scheme).

168.    These transactions provide substantial evidence of the defendants' involvement in monetary transactions concerning property derived from unlawful activities, as stipulated under 18 U.S.C. § 1957. Such activities are consistent with the pattern of racketeering in this case, underscoring the defendants' use of illicitly obtained funds to acquire and enjoy luxury assets, and further validating the plaintiffs' claims of financial misconduct.

## Transportation of Stolen, Converted, or Fraudulently Taken Goods, Securities, or Money – Pursuant to 18 U.S.C. § 1961(1)

169.    Section 1961(1) of the RICO Act, which defines "racketeering activity" to include various federal crimes, including the "Transportation of Stolen, Converted, or Fraudulently Taken Goods, Securities, or Money" under 18 U.S.C. § 2314 and 2315.

o   **18 U.S.C. § 2314**: This statute criminalizes the interstate or foreign transportation of stolen, converted, or fraudulently taken goods, securities, or money.

o   **18 U.S.C. § 2315**: This statute criminalizes the receipt, possession, or disposal of stolen, converted, or fraudulently taken goods, securities, or money.

170.    The Defendants facilitated the transfer of these misappropriated funds through various channels, including personal cryptocurrency accounts, offshore entities, and unregistered financial platforms, across state and international borders.

171.    The fraudulent transportation involved substantial sums of money, including the net unreturned deposits totaling $1,486,723.66 from the Plaintiffs, which were initially received under false pretenses of investment safety and profitability.

## Wire Fraud – Pursuant to 18 U.S.C. § 1962(c)

172.    Pursuant to 18 U.S.C. § 1962(c), the Plaintiffs allege that the Defendants, individually and collectively, engaged in a pattern of racketeering activity through multiple acts of wire fraud, in violation of 18 U.S.C. § 1343.

173.    Under 18 U.S.C. § 1343, wire fraud occurs when a person, having devised or intending to devise any scheme or artifice to defraud, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice.

174.    The Defendants engaged in wire fraud by executing a fraudulent scheme designed to induce the Plaintiffs and other investors to deposit funds into accounts purportedly for investment in foreign exchange (forex) trading through CFT's trading software and the broker FxWinning. The specifics of this fraudulent scheme are as follows:

o    The Defendants utilized electronic means, including email, text messages, and the Telegram messaging platform, to communicate with Plaintiffs regarding the purported investment opportunities. These communications included providing fraudulent account information, transmitting false statements about the performance and safety of the investments, and sending fabricated documents, such as account statements and trading records, intended to deceive Plaintiffs into believing that their investments were secure and profitable.

o    The Defendants caused electronic transfers of funds from Plaintiffs located in New Jersey and other states into accounts controlled by the Defendants. These funds were falsely represented to be invested in forex trading but were instead misappropriated by the Defendants for their personal gain.

- o The Defendants, including CEO Bastos and COO Percy, conducted virtual meetings via platforms like Zoom, which were attended by Plaintiffs. During these meetings, the Defendants made false representations about the legitimacy and profitability of the investment scheme, leading Plaintiffs to continue their participation and further investment.

- o Defendant Israel used social media platforms, particularly Facebook, to post motivational content and testimonials about the purported success of the CFT trading software. These posts were designed to lure more investors, including Plaintiffs, into the fraudulent scheme. Specific posts were seen and acted upon by Plaintiffs Masters, Lewis, Nicasio, and Pack, who subsequently invested in the scheme based on these misrepresentations.

### Representative Examples of Fraudulent Wire Communications

a. Assurances of Profits and Participation:
   - o Texts from Defendant Santana to Plaintiff Elsisi stating that the enterprise had produced profits of 199% in the first nine months of 2022 and requiring a $50,000 minimum investment (dated 8/19/22).
   - o Defendant Marshall's text to Plaintiff Masters assuring her of the safety of CFT and her ability to withdraw funds at any time (dated 11/3/22).
   - o Defendant Percy's text reassuring investors that all assets were safe (dated 7/14/22).

b. Guidance on Fraudulent Activities:
   - o Defendant Marshall's text to Plaintiff Springfield instructing him on how to proceed with the fraudulent venture.
   - o Defendant Santana's text to Plaintiff Kanan acknowledging receipt of a $500 payment for creating an offshore corporation and promising to "send over the paperwork" (dated 9/20/22).

c.   Transmission of Forged Documents:

   o   The forged Certificate of Incorporation for Plaintiff Khder's purported offshore corporation, uploaded to the FxWinning website on or about 8/20/22.

   o   The forged Legal Entity Certificate for Plaintiff Roman's purported offshore corporation, transmitted electronically by offshore agent Alexander Garcia (dated 7/14/22).

   o   Forged Certificates of Incorporation for Plaintiffs Walker, Yeng, and Rosner's purported offshore corporations, uploaded to FxWinning on or about 6/1/22, 8/20/22, and 10/18/22, respectively.

d.   Fraudulent Agreements and Onboarding:

   o   The Three-Way Agreement between Plaintiff Marquez, Defendant CFT, and FxWinning, exchanged electronically on or about 11/15/21.

   o   The Three-Way Agreement between Plaintiff Sharafeldin's purported offshore corporation, Defendant CFT, and FxWinning, exchanged electronically on or about 9/20/22, alongside its forged Certificate of Incorporation (uploaded on or about 8/20/22).

   o   The Three-Way Agreement between Plaintiff Szabo, Defendant CFT, and FxWinning, exchanged electronically on or about 6/26/22.

e.   Manipulation via Social Media:

   o   Defendant Israel's Facebook posts promoting the profitability of CFT trading software and his personal success stories.

   o   Text messages by Stephane Paul, using the alias "Vince," and Israel arranging the creation of Plaintiff Lewis's offshore corporation.

f.   Additional Fraudulent Communications:

   o   Defendant Santana's text to Plaintiff Pinos instructing him on completing documents on the CFT website (dated 9/9/22 and 9/11/22).

     o   Defendant Santana's exchange with Plaintiffs Elsisi, Pinos, and others, guiding them through the onboarding process and submitting documents.

175.    The Defendants committed a substantial number of related predicate acts over an extended period as part of their general course of business. These acts demonstrate a clear intent to continue their fraudulent activities unless and until they are prevented from doing so. Notably, CFT's website remains operational, further indicating their ongoing intent to perpetuate the scheme.

## C. Injuries to Plaintiffs – Pursuant to 18 U.S.C. § 1962(c) and 18 U.S.C. § 1964(c)

176.    This claim is brought under **18 U.S.C. § 1962(c)**, which makes it unlawful for any person employed by or associated with an enterprise engaged in or affecting interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

177.    **18 U.S.C. § 1964(c)** provides that "any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

178.    The Plaintiffs have collectively suffered substantial financial losses due to the Defendants' fraudulent and unlawful conduct. The Defendants, through a coordinated scheme, solicited and accepted a total of $1,486,723.66 in deposits from the Plaintiffs under the pretense of legitimate forex trading activities, only to misappropriate these funds for their personal gain. Despite repeated requests for withdrawals, the Plaintiffs have been denied access to their own funds, resulting in a total unrecovered balance of $2,389,123.23.

179.    The Plaintiffs have also suffered significant emotional and psychological harm due to the Defendants' deceitful practices. The Defendants' persistent manipulation, including the provision of fake documents and the use of intimidation tactics to prevent the Plaintiffs from pursuing legal recourse, has caused undue stress, anxiety, and emotional distress. This harm is exacerbated by the Plaintiffs' feelings of betrayal and powerlessness, having trusted the Defendants with their life savings and financial security.

180.    As a direct result of the Defendants' actions, the Plaintiffs have been deprived of business and financial opportunities. The funds that were fraudulently taken by the Defendants could have been invested in other legitimate ventures, resulting in lost potential income and growth. The Plaintiffs' ability to engage in other financial or business activities has been severely impaired due to the depletion of their financial resources.

181.    The Plaintiffs have incurred significant legal and administrative costs in their efforts to recover the funds wrongfully taken by the Defendants. These costs include attorneys' fees, court fees, and other expenses associated with the ongoing litigation. Under **18 U.S.C. § 1964(c)**, the Plaintiffs seek recovery of these costs, in addition to treble damages for their injuries.

182.    The Defendants' fraudulent activities have also caused damage to the Plaintiffs' reputations, both personally and professionally. The Plaintiffs' association with a fraudulent investment scheme has caused harm to their standing in their communities and among their peers, impacting their ability to engage in future business ventures or secure financial opportunities.

183.    The injuries suffered by the Plaintiffs are a direct and proximate result of the Defendants' pattern of racketeering activity, as defined under **18 U.S.C. § 1961(1)**,

which includes acts of fraud, money laundering, and the creation of forged documents. The Defendants' fraudulent conduct was not isolated, but rather part of a systematic and continuous scheme to deceive and defraud investors, including the Plaintiffs, through the use of offshore corporations, fake documents, and manipulated trading platforms.

184.    The Plaintiffs' injuries are further exacerbated by the Defendants' use of interstate and international communications, including emails, social media, and messaging platforms like Telegram, to perpetrate their scheme and maintain control over the Plaintiffs' funds.

185.    The Plaintiffs respectfully request that this Court recognize the severe and multifaceted injuries they have sustained as a result of the Defendants' racketeering activities. Pursuant to **18 U.S.C. § 1964(c)**, the Plaintiffs seek treble damages, recovery of their legal and administrative costs, and any other relief deemed just and proper by this Court.

## COUNT II

## RICO CONSPIRACY - N.J.S.A. 2C:41-2(d)

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This count is against all Defendants.

186.    Under this statute, it is unlawful for any person to conspire to violate any of the provisions of the New Jersey RICO Act. Specifically, this section criminalizes the agreement or combination of two or more persons to participate in the affairs of an enterprise through a pattern of racketeering activity. "It shall be unlawful for any person to conspire as defined by N.J.S.A. 2C:5-2 to violate any of the provisions of this section."

187.    The defendants, through their coordinated actions, engaged in a pattern of racketeering activity designed to defraud the plaintiffs and others similarly situated. This

pattern involved multiple predicate acts, including wire fraud, mail fraud, and money laundering, all orchestrated to sustain and conceal their fraudulent investment scheme.

188.    The RICO conspiracy in this case centers on the defendants deliberate and systematic efforts to deceive and exploit the plaintiffs, including those in New Jersey. Presenting themselves as legitimate financial professionals, the defendants solicited substantial investments through a fraudulent enterprise. They employed fake offshore corporations, manipulated trading software, and forged documents to fabricate a facade of profitability and security. These actions were part of a coordinated and ongoing criminal operation with significant interstate ties, including direct connections to New Jersey.

189. The defendants acted with specific intent and knowledge that their conduct would financially harm the plaintiffs. By creating fake offshore corporations in Jamaica, Panama, and Haiti, and using social media and encrypted platforms like Telegram to advance their scheme, the defendants not only defrauded plaintiffs but also obstructed their ability to seek legal recourse. The scheme's interstate and international scope, combined with efforts to evade regulatory scrutiny and accountability, highlights a RICO conspiracy centered in New Jersey.

190.    The defendants' targeted fraudulent activities toward New Jersey plaintiffs establish a clear basis for jurisdiction under RICO. Their coordinated actions, shared intent to defraud, and operation as an "enterprise" under the statute constitute a conspiracy to violate RICO. Plaintiffs' substantial financial losses directly resulting from this conduct justify applying RICO's civil remedies to seek justice and recover damages.


## COUNT III

## FRAUD IN THE INDUCEMENT

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This Count is against All Defendants named in this Complaint.

191.    As alleged above, Defendants, including CFT and FxWinning executives and agents, made repeated representations to Plaintiffs, inducing them to invest substantial funds in what was portrayed as a secure and highly profitable opportunity. Defendants claimed that investing through FxWinning, using CFT's trading software, would yield significant and safe returns. They further led certain Plaintiffs to believe that creating offshore corporations was necessary to access the investment, directing them to individuals who facilitated this process. These representations were made personally and collectively by Defendants in their roles as CFT agents and executives.

192.    The Defendants knowingly made false representations, including promising returns based on manipulated trading data and fraudulent activity within the FXWinning platform. They also misled Plaintiffs by portraying the creation of offshore corporations as a legitimate requirement for investment, while these entities were merely forged documents. Plaintiffs were deceived into believing they were compliant with international financial regulations, when in fact, they were victims of fraud.

193.    The Defendants knowingly and intentionally misled Plaintiffs into transferring funds to FXWinning by falsely presenting it as a legitimate, high-return investment platform. Acting individually and as CFT agents, Defendants were aware of the common ownership and fraudulent design of FXWinning and CFT, deliberately concealing their deceptive operations to induce substantial investments.

194.    The Plaintiffs reasonably relied on Defendants' assurances that their investments with FXWinning were secure, well-managed, and capable of yielding significant returns. Based on these representations, Plaintiffs invested over $1.4 million, which Defendants reported had grown to more than $2.3 million.

195.    As a result of Defendants' fraudulent inducement, Plaintiffs suffered substantial financial harm. Under Defendants' direction, CFT withheld Plaintiffs' invested funds, failing to return the deposits or the purported investment value. Plaintiffs

also incurred additional losses from fees paid for the creation of offshore corporations, which were later revealed to be forged and non-existent.

196.    Defendants knowingly engaged in deceptive, willful, and malicious conduct intended to harm Plaintiffs. Their actions were designed to maximize their economic gain by misappropriating and retaining Plaintiffs' invested funds.

197.    The Defendants' fraudulent misrepresentations directly and foreseeably caused the Plaintiffs' damages. Absent the Defendants' deceptive conduct and lack of disclosure, the Plaintiffs would not have invested with FXWinning or paid for offshore corporations.

198.    As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs suffered losses exceeding $2.3 million in unreturned funds and promised returns. Plaintiffs seek to recover these damages along with punitive damages, attorneys' fees, costs, and interest, given the willful and malicious nature of Defendants' misconduct, to deter such actions in the future.

## COUNT IV

## ABUSE OF PROCESS

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This count is against CFT and Basos.

199.    Abuse of process is actionable under New Jersey law where there is "a misuse or perversion of the process for a purpose that is not the legitimate purpose of the process." LoBiondo v. Schwartz, 199 N.J. 62, 90 (2009).

200.    Defendants intentionally and maliciously used legal proceedings, including but not limited to the lawsuit styled CFT Solutions LLC v. FxWinning LTD, for an ulterior purpose unrelated to the proper purpose of the legal process.

201.    The Defendants' lawsuit against FxWinning was a tactic to delay the Plaintiffs' claims and run out the statute of limitations, protecting themselves from liability. This was not a genuine effort to seek justice but a strategy to prevent the Plaintiffs from going to court. At the same time, the Defendants tried to appear as victims of FxWinning, shifting blame away from their own fraudulent actions. This misleading approach shows a broader scheme by the Defendants to avoid accountability through manipulation rather than addressing the real issues. This is evidenced by the following facts:

- On May 5, 2023, CFT initiated a lawsuit against FxWinning, notably filed just under two months after FxWinning allegedly suspended all investor withdrawals and implemented stringent KYC (Know Your Customer) and AML (Anti-Money Laundering) authentication procedures. Despite these restrictions, investors' accounts remained active, with trading activities apparently persisting until approximately the end of June 2023 using CFT's software (Exhibit 69 - Continued Operation of CFT's Software Post-Lawsuit Filing).

- This timeline raises significant concerns regarding CFT's lawsuit against FxWinning. Despite the ongoing lawsuit, trading operations continued, and CFT allowed FxWinning to keep using its software. This behavior suggests that CFT may have been aware of hidden issues, such as assets being frozen by the authority conducting the KYC verifications, which were not disclosed to the Plaintiffs.

- Furthermore, the lawsuit focuses solely on a breach of contract and the recovery of losses for CFT's own interests, without addressing the broader implications for the trading activities or their eventual cessation. This approach implies that the lawsuit may be a deliberate tactic to obscure the full extent of the situation, while delaying or potentially blocking investors' claims.

- Bastos, while maintaining close communication with FxWinning's CEOs, Brito and Merino, actively participated in developing and maintaining the FxWinning.pro website. This platform facilitated trading of investors' funds, including those of the Plaintiffs, even after withdrawals had ceased. Such actions clearly demonstrate that CFT and FxWinning continued to operate as partners, rendering the lawsuit between them a mere façade intended for appearances (Exhibit 70 – Brito's Testimony).

- Bastos did not invest in FxWinning, yet he sued FxWinning for a total of $50 million on behalf of himself and CFT, despite the fact that CFT's investors, including the Plaintiffs, suffered losses exceeding $350 million. This disparity further demonstrates that Bastos did not file the lawsuit to recover lost funds or money for the investors, but rather to create the illusion that he too was a victim of FxWinning (Exhibit 71 – Communications from Percy's Phone).

- In or around May/June 2023, during a live Zoom meeting co-hosted by Bastos and Percy with CFT's agents, Bastos mentioned that his son was 9 months old. Although the video bears the date of June 15, 2023, Bastos's statement places the meeting sometime in May. Plaintiff Szabo attended this meeting upon Defendant EL's invitation. The meeting focused on the ongoing KYC requirements from the broker, FxWinning, and introduced new cryptocurrency trading software. Percy talked about risk management and his planned trips to London to meet representatives from Lloyd's of London to secure insurance for investors' funds. At that time, CFT was in a lawsuit against FxWinning, accusing them of RICO violations and fraud, and claiming a $50 million loss, while suggesting that FxWinning still held $350 million of investors' money (Exhibit 72 – Minute Mark in the Video – https://drive.google.com/file/d/1OYWDYaHscgDIjzM81jHLCNi_BUiYRQfU/view?usp=drive_link ).

- Despite the ongoing litigation over lost funds, the meeting focused on obtaining insurance for over $2 billion, implying that CFT and its leaders had access to a large

sum of money needing protection. Plaintiffs find this suspicious, as there would be no need to insure funds they don't possess. Moreover, Percy stated that the broker did not hold any funds, as they were kept by the liquidity provider. This raises further concerns for the plaintiffs about who actually controls the funds and whether they are available.

- B2Broker, the liquidity provider when FxWinning stopped withdrawals, denied holding investors' money in an email to the plaintiffs. They said they could provide more details if requested by the court.

- Percy traveled to Dubai in or around May/June 2023, where he met Brito. Following this meeting, Percy informed investors that he had seen their funds at the liquidity provider's site. He mentioned that the details were accessible only to the attorneys, presumably those at the Mullins Law Firm. Plaintiffs emphasize that the liquidity provider and FxWinning are distinct entities. This distinction was explicitly acknowledged by Percy himself during the Zoom meeting in May/June, which contradicts any assertions or representations made by the Defendants that FxWinning is in possession of CFT or the investors' funds.

- El, an agent and close acquaintance of Bastos, disclosed that the lawsuit was merely a smokescreen to prevent investors from seeking legal action against CFT, knowing that FxWinning lacked funds to satisfy any judgments.



- The Know Your Customer (KYC) and Anti-Money Laundering (AML) procedures, reportedly initiated by B2Broker, effectively halted the activities of CFT and FxWinning. While verifying an investor's identity and financial status is typically a rigorous process, the Plaintiffs, who submitted fake documents, were falsely led to believe they had passed these checks. This demonstrates that CFT and FxWinning misled the investors, as a legitimate verification process would have flagged any fraudulent documentation or misleading information, such as listing "US Virgin Islands" instead of "USA" as the investor's location.

- Plaintiffs assert that Defendants' scheme, involving FxWinning, was designed not only to defraud investors but also to evade U.S. regulatory scrutiny. Any attempt to return funds, particularly through cryptocurrency transactions converted to fiat currency, would likely have triggered mandatory reporting under the Bank Secrecy Act (BSA), including Suspicious Activity Reports (SARs) filed with FinCEN. To avoid detection of potential money laundering or financial crimes, Defendants obstructed withdrawals and misled investors about the status of their funds, opting to deflect blame rather than disclose the scheme's true nature.

- The delays in the serving process on FxWinning, Brito, and Merino, including resorting to service through the Florida Secretary of State, further demonstrate CFT's intentional prolonging of legal procedures, all while Bastos maintained close contact with Brito and Merino well into July 2023 (Exhibit 73 - Florida Department of State Service Despite Ongoing Communication with FxWinning CEOs).

- The Defendants' use of the lawsuit to mislead and manipulate investors, including but not limited to the inclusion of CFT investors such as Jay Katari under false pretenses, confirms the ulterior motives behind the legal action. Mr. Katari was invited by Percy to participate in the lawsuit at no cost for legal representation, as the costs were covered by CFT and Bastos, not only for Mr. Katari but for every plaintiff involved in the lawsuit (Exhibit 74 - Jay Katari's Statement).

- The Defendants deliberately sowed confusion, as seen in Bastos's Zoom meeting message after withdrawals ceased. Although addressed to agents, Bastos knew it would reach investors, at the end of the meeting instructing agents to relay the message. He justified the sudden focus on KYC requirements, promoted new cryptocurrency trading software, and falsely assured investors they could retrieve their funds if they chose to exit. These empty promises, coupled with continued withdrawal halts, underscore the Defendants' intent to mislead and evade accountability (Exhibit 75 – The Entire Zoom Meeting –

  https://drive.google.com/file/d/1OYWDYaHscgDIjzM81jHLCNi_BUiYRQfU/view?usp=drive_link ).

- CFT's litigation against FxWinning and its CEO, Brito, was a strategic cover-up. After FxWinning defaulted in July 2024 and became unable to defend itself, CFT sought default judgment only on breach of contract, despite having pending claims for RICO violations, money laundering, and fraud. In January 2025, CFT voluntarily dismissed all other counts against FxWinning. Similarly, despite securing a default against Brito

in November 2024 based on a RICO-included amended complaint, CFT voluntarily dismissed all but common law fraud and breach of contract in March 2025. This conduct shows CFT's intent was not to seek redress for fraud or money laundering, but to create a staged proceeding that concealed its own involvement in the scheme.

202.    As a result of the Defendants' misuse of the legal process, the Plaintiffs and other investors have suffered and continue to suffer damages and emotional distress, including, but not limited to, the potential loss of their legal rights to pursue claims against the Defendants.

## COUNT V

## FRAUDULENT CONCEALMENT

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This count is against Bastos and CFT.

203.    Under New Jersey law, fraudulent concealment requires showing: (1) the defendant had a legal duty to disclose a material fact; (2) the defendant knowingly failed to disclose that fact; (3) the defendant intended to deceive the plaintiff; (4) the plaintiff relied on the defendant to their detriment; and (5) the plaintiff suffered damages as a result. Rosenblit v. Zimmerman, 166 N.J. 391, 406-07 (2001).

204.    Defendants had a legal duty to disclose material facts regarding the true financial status of FxWinning, the genuine nature of the lawsuit CFT Solutions LLC v. FxWinning LTD, and the lack of intention to secure any meaningful recovery for Plaintiffs and other investors.

- ¶125: Filing of the lawsuit CFT Solutions LLC v. FxWinning LTD and its implications.

- ¶122: Brito's testimony about B2Broker holding funds, creating an obligation for clarity.
- ¶128-129: Withholding the truth about fraudulent document approvals and KYC failures.

205.    Defendants knowingly failed to disclose these facts, including but not limited to:

• The fact that FxWinning lacked the financial resources to satisfy any judgment.

• The fact that the lawsuit was not filed to genuinely recover funds but rather to delay and obstruct Plaintiffs' ability to seek legal recourse.

206.    Defendants intentionally concealed these facts to deceive the Plaintiffs and other investors, making it appear as though the lawsuit was a genuine attempt to recover funds from FxWinning and that the issues with withdrawals were unrelated to CFT's activities.

- ¶123: Communications misrepresenting temporary withdrawal issues.
- ¶125: Lawsuit filed to mislead investors into believing it aimed to recover funds.
- ¶128-129: Concealing issues with KYC/AML approvals and their invalidity.

207.    Plaintiffs and other investors relied on these misrepresentations and omissions, believing that the lawsuit and the subsequent actions taken by Defendants were in their best interests and aimed at securing the return of their investments.

- ¶122-123: Plaintiffs trusted reassurances about funds being safe and withdrawal issues being temporary.

- ¶125: Plaintiffs believed the lawsuit was genuine and in their best interest.

- ¶129: Plaintiffs were misled into thinking that the issues with document approvals would not hinder recovery.

208.    As a result of the fraudulent concealment, Plaintiffs and other investors suffered significant damages, including but not limited to the loss of their investments and the inability to seek timely legal recourse against the Defendants.

## COUNT VI

## CONSTRUCTIVE TRUST

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This count is against all Defendants.

209.    Under New Jersey law, constructive trust may be imposed when a person has wrongfully obtained or holds title to property that, in equity and good conscience, should be held by another. McKelvey v. Passaic County, 174 N.J. 369, 384 (2002).

210.    Defendants wrongfully obtained or hold title to the Plaintiffs' and other investors' funds, which were invested in good faith based on fraudulent representations and concealments.

- ¶112: Defendants lured Plaintiffs with promises of profits, securing funds through fraudulent LPOAs.

- ¶116: Creation of fake offshore corporations to legitimize their control over funds.

- ¶127: Misappropriation of funds through internal transfers to Bastos's personal cryptocurrency accounts.

- ¶148-150: Roman's funds transferred to EL's account and then diverted to Bastos.
- ¶140: Nonexistence of offshore corporations confirming wrongful retention of funds.

211. Defendants' conduct, including but not limited to fraudulent misrepresentations and the use of the lawsuit as a means to obstruct Plaintiffs' claims, establishes that it is unjust for them to retain the funds.

- ¶113: Misrepresentation about KYC/AML processes as a condition for valid LPOAs.
- ¶125: Filing of a lawsuit against FxWinning as a smokescreen to delay Plaintiffs' claims.
- ¶128-129: Continued denial of withdrawals despite knowing documents and accounts were fraudulent.
- ¶130: FxWinning's default and misrepresentation about possession of investors' funds.

212. A constructive trust should be imposed on the funds wrongfully obtained by the Defendants to ensure that the Plaintiffs receive the proper remedy for their losses.

- ¶127: Clear evidence of funds being funneled to personal accounts and misappropriated.
- ¶140: Confirmation from Jamaican authorities regarding the nonexistence of claimed corporations.
- ¶147: Panama registry verifying that Plaintiffs' corporations were fake, further justifying the imposition of a trust.

- ¶150: Text messages from EL revealing the diversion of funds to Bastos's accounts, substantiating the claim for a constructive trust.

213.    The imposition of a constructive trust is necessary to prevent unjust enrichment of the Defendants and to provide equitable relief to the Plaintiffs.

## COUNT VII

## CIVIL CONSPIRACY

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This count is against Bastos and CFT.

214.    Under New Jersey law, a civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Morgan v. Union County Bd. of Chosen Freeholders*, 268 N.J. Super. 337, 364 (App. Div. 1993).

215.    Defendants CFT and Bastos, in cooperation with FxWinning's CEOs, Merino and Brito, knowingly and willfully conspired to delay justice and prevent investors from pursuing legal action against CFT by filing a sham lawsuit against FxWinning in May 2023. This lawsuit was not intended to seek genuine redress but was instead designed to mislead and obstruct investors, concealing the true status of their funds while running out the statute of limitations. Conveniently, a partial default was entered in that case as FxWinning and its representatives were unable to continue the case pro se.

- ¶125: Filing of a lawsuit against FxWinning as a smokescreen to delay legal actions and obstruct justice.

- ¶129: Delay in disclosing the lawsuit against FxWinning, suggesting intentional obstruction.
- ¶130: Partial default in the FxWinning lawsuit due to FxWinning's financial struggles, showing it was not a genuine legal effort.

216.    Defendants, including but not limited to Bastos and CFT, and others, engaged in overt acts in furtherance of this conspiracy, including:

- Filing and prosecuting a lawsuit with the knowledge that it was not intended to secure any recovery for the Plaintiffs, nor to obtain a resolution that would lead to the recuperation of funds (¶125).
- Misleading Plaintiffs and other investors about the true purpose and potential outcome of the lawsuit (¶126-127).
- Concealing material facts about the financial status of FxWinning and the motivations behind the legal action (¶129-130).

217.    Plaintiffs respectfully submit that Defendants' list for Initial Disclosure in the jurisdictional discovery phase of the present case includes several individuals who were also defendants in the case of *CFT Solutions LLC v. FxWinning LTD*. Notably, David Merino is identified as being "knowledgeable of FxWinning's business, its software, and the Plaintiffs' claims and allegations," while Rafael Cutie is similarly described. The inclusion of these individuals, along with others from the aforementioned case, raises concerns regarding the potential abuse of legal processes, fraudulent concealment of critical information, and/or a coordinated civil conspiracy to obstruct justice. Such conduct undermines the integrity of the judicial process and exacerbates the need for comprehensive and transparent legal redress (Exhibit 76 – Defendants' Initial Disclosures).

- ¶125: Coordination between CFT and FxWinning in filing the lawsuit and obscuring critical details.
- ¶131: Operational collaboration between CFT and FxWinning that undermines claims of independence.
- ¶130: Inclusion of individuals like Brito in disclosures, raising concerns about abuse of legal processes.

218.    Defendants have actively sought to avoid investigation and accountability, as evidenced by the Plaintiffs' and their counsels' persistent efforts to seek justice through multiple complaints submitted to the FBI, SEC, and District Attorneys in New York, New Jersey, Florida, and Wisconsin, the Attorney General in Florida, as well as to Florida Governor Ron DeSantis, all of which have yielded no results (Exhibit 77 – Plaintiffs' Complaints to Authorities). Additionally, Brazilian investors reported Bastos to Governor DeSantis without any recourse, further underscoring the defendants' attempts to evade scrutiny (Exhibit 78 - Brazilian Investors' Complaint).

- ¶114: Misrepresentation of investor locations to circumvent regulations.
- ¶125: Filing of a sham lawsuit to deflect legal actions and buy time.

219.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs have suffered damages, including but not limited to financial losses, and emotional distress.

## COUNT VIII

## VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT ("CFA"), N.J.S.A. 56:8-1 ET SEQ.

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This count is against all Defendants.

220.    The conduct of Defendants towards the Plaintiffs constitutes an unlawful practice, unconscionable commercial practice, deception, fraudulent promises, and misrepresentations.

221.    Defendants, including the corporation and its agents, knowingly orchestrated a fraudulent scheme by misrepresenting their trading software as legitimate, fabricating offshore corporations, and falsely assuring Plaintiffs of the safety and legality of their investments.

- **¶111**: Promotion of trading software as legitimate and profitable.

- **¶113**: False claims regarding KYC/AML verifications.

- **¶116**: Fabrication of offshore corporations.

- **¶127**: Misappropriation of funds into personal cryptocurrency accounts

222.    Defendants misled the New Jersey Plaintiffs through official Telegram channels by promoting the scheme, hosting meetings, and delivering presentations that falsely promised profitability and safety while concealing the operation's fraudulent nature and risks.

- ¶115: Communications on Telegram emphasizing investor scrutiny and controls.

- ¶118: Convention in the Bahamas with assurances of safety and profitability.

- ¶129: Delay in disclosure of litigation to conceal the scheme's fraudulent nature.

- ¶131: Coordination between CFT and FxWinning to present a façade of legitimacy.

223.    Defendants, individually and collectively, orchestrated the creation of fake offshore corporations through agents like Santana and Israel, who misrepresented their legitimacy. These entities were falsely presented as necessary for investment, coercing

New Jersey Plaintiffs into paying additional fees and exposing them to heightened risks without proper disclosure.

- ¶114: Use of fake Jamaican IDs and registration in the U.S. Virgin Islands.

- ¶116: Creation of fake corporations as a strategy to coerce payments.

- ¶140: Payments by New Jersey Plaintiffs for non-existent Jamaican corporations.

- ¶156: Masters' discovery of forged Panamanian corporation documents.

224.    The Defendants, including the CEO of CFT, accepted and instructed others to accept investor funds into personal cryptocurrency accounts, adding another layer of deception and creating a façade of professionalism and regulatory compliance, while misappropriating these funds for personal gain and to sustain the fraudulent enterprise.

- ¶127: Internal transfers funneled through personal cryptocurrency accounts.

- ¶148-149: EL's acceptance of Roman's funds into his personal account and diversion to Bastos.

- ¶150: Text messages revealing misappropriation of investor funds into Bastos's crypto wallets.

225.    As a direct and proximate result of Defendants' unlawful conduct, the New Jersey Plaintiffs suffered ascertainable losses, including but not limited to, the total loss of their initial deposits, fees paid for fake offshore corporations, and the value of purported profits displayed on manipulated trading platforms.

- ¶140: Fees paid for fake Jamaican corporations.

- ¶142: Table of net unreturned deposits and last known balances for NJ Plaintiffs.

- ¶128-129: Manipulated trading platforms displaying false profits.

- ¶150: Diversion of funds causing ascertainable losses.

226.    Under the CFA, Defendants are liable to the New Jersey Plaintiffs for mandatory treble damages and attorney's fees, and also for punitive damages, due to their intentional, fraudulent, and unconscionable conduct that caused substantial financial harm to the Plaintiffs.

## COUNT IX

## VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This count is against all Defendants.

227.    Plaintiffs relied on Defendants' assurances of profitability and safety in investing through CFT trading software, facilitated by FxWinning. Defendants promised substantial returns while concealing their financial instability and inability to process withdrawals.

- ¶111: Promises of safe and profitable investments.
- ¶113: False assurances about KYC and AML verifications.
- ¶123: Misleading communications during withdrawal halts.
- ¶129: Concealing instability and delays by CFT and FxWinning.

228.    Defendants falsely claimed to establish legitimate offshore corporations in Jamaica, Haiti, and Panama, knowing the entities and documents were fraudulent, to evade regulatory scrutiny and falsely project credibility.

- ¶114: Use of fake Jamaican IDs and offshore corporations.
- ¶116: Creation of fraudulent offshore entities for regulatory evasion.

- ¶138-139: Payments for Jamaican and Haitian corporations that were fake.

- ¶146-147: Fake Panamanian corporations provided by CFT agents.

229.    Defendants, including CFT's CEO and COO, used social media, Telegram, and in-person events like the 2022 Bahamas convention to promote false and misleading claims about the investment's safety and legitimacy, knowing or recklessly disregarding their falsity or material omissions.

- ¶111: Social media promotion by Israel to attract investors.

- ¶118: Bahamas convention used to promote legitimacy.

- ¶141: Santana's reassurances to NJ Plaintiffs about safety and profitability.

- ¶153: Israel's social media activity promoting trading software.

230.    Defendants manipulated the MT5 trading software to fabricate profits, deceiving Plaintiffs about investment performance to encourage further deposits and block withdrawals, unlawfully retaining control of Plaintiffs' funds.

- ¶131: Collaboration between CFT and FxWinning to create the illusion of gains.

- ¶127: Internal transfers and misappropriation to fabricate trading activity.

- ¶150: Evidence of funds diverted to Bastos's accounts, creating false gains.

231.    In February 2023, when FxWinning halted withdrawals, Defendants falsely attributed the pause to KYC and AML requirements from a liquidity provider. Exploiting Plaintiffs' anxiety, Defendants, including Israel and his Haitian connections, offered Haitian offshore corporations to purportedly meet these requirements and restore access to funds.

- ¶121: KYC and AML verification requirements leading to withdrawal freezes.

- ¶124: Israel's Haitian connections providing fake offshore corporations.

- ¶128: Plaintiffs' compliance with illegitimate KYC requests despite document fraud.

- ¶129: Delays and misdirection by CFT and FxWinning during the withdrawal crisis.

232.    These acts and omissions constitute deceptive, unfair, and unconscionable practices under FDUTPA, as they were undertaken with the intent to deceive Plaintiffs and unfairly profit at their expense. Defendants' actions offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Plaintiffs.

233.    As a direct and proximate result of Defendants' violations of Section 501.204, Florida Statutes, Plaintiffs have suffered actual damages, including but not limited to the loss of their principal investments, lost profits, and emotional distress.

234.    Pursuant to Section 501.211, Florida Statutes, Plaintiffs seek a declaration from the Court that Defendants' misrepresentations are deceptive, unfair, and unconscionable and thus violate FDUTPA. Plaintiffs further seek a mandatory injunction requiring Defendants to return all of their ill-gotten gains connected to Plaintiffs, recovery of their actual damages, and recovery of their attorney's fees and costs pursuant to Sections 501.2105 and 501.211(2), Florida Statutes.

## COUNT X

### SECURITIES EXCHANGE ACT OF 1934 AND RULE 10B-5, 15 U.S.C. § 78J(B) and 17 C.F.R. § 240.10B-5

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This count is against all Defendants.

235.    This claim is brought under § 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.

236.    The Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs, in violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

237.    As set forth above, Defendants, individually and in concert, directly and indirectly, represented to Plaintiffs that the investment funds were held in accounts that would be used for forex trading in a manner that was both profitable and safe.

- ¶111: Promotion of investment as profitable and safe using trading algorithms.

- ¶112: Promises of guaranteed monthly profits.

- ¶141: Santana assured safety and profitability to NJ Plaintiffs.

- ¶152: Israel's promotion of profitable trading software.

238.    Defendants' representations were materially false and misleading and were made with the intent to deceive Plaintiffs into investing their funds in Defendants' fraudulent schemes and artifices.

- ¶113: Misrepresentation of KYC/AML verifications.

- ¶115: Claim that investors couldn't circumvent the broker's scrutiny.

- ¶118-119: Efforts to legitimize the scheme by involving political figures and a regulated liquidity provider.

- ¶126-127: Diversion of funds through deceptive practices.

239.    The false representations by Defendants were made in connection with the purchase of securities. Plaintiffs invested their money in a common enterprise under the expectation of future profits, which were to be generated by the efforts of Defendants, both individually and in concert.

- ¶112: Use of the Three-Way LPOA Agreement (investment vehicle).

- ¶113: Misrepresentation of the conditions for effective LPOAs.

- ¶125: Lawsuit used as a smokescreen to protect fraudulent schemes.

- ¶131: Collaboration between CFT and FxWinning in executing the scheme.

240.    Defendants knew that they did not, in fact, intend to honor the terms of Plaintiffs' investments. The statements made by Defendants to solicit Plaintiffs' funds were materially false and misleading, as Defendants were aware that the funds were not being used as represented for legitimate trading or other lawful investment purposes.

- ¶114-116: Use of fake Jamaican IDs and offshore corporations.

- ¶120-121: Forgery of KPMG letter and KYC irregularities.

- ¶128-129: Continued denial of withdrawals despite knowing documents were illegitimate.

241.    Defendants employed manipulative and deceptive devices and contrivances in connection with Plaintiffs' investments, including, but not limited to, creating fake offshore corporations, issuing forged documents, falsely assuring the safety and profitability of the investments, and manipulating trading software to create the illusion of gains.

- ¶116: Creation of fake offshore corporations.

- ¶127: Internal transfers misappropriating funds.

- ¶149-150: Diversion of funds to personal accounts.

- ¶153-156: Forged Panamanian corporations and manipulation of trading software.

242.    Defendants also knowingly withheld material information, such as the true financial condition of FxWinning, the cessation of withdrawal requests, and the actual use of investors' funds, which were misappropriated and diverted for Defendants' personal gain.

- ¶113: Failure to conduct KYC/AML verifications.

- ¶121: Concealing irregularities discovered by B2Broker.

- ¶128-129: Misleading Plaintiffs about document approvals.

- ¶130: Financial struggles of FxWinning and conflicting narratives.

243.    Had Plaintiffs known that Defendants' representations were false and misleading, and that Defendants were operating a fraudulent scheme rather than engaging in legitimate trading activities, Plaintiffs would not have deposited funds with FxWinning.

- ¶111-112: Belief in the safety and profitability of the investment.

- ¶141: Assurance of profitability and security by Santana.

- ¶150: Roman's discovery of diverted funds after being misled.

- ¶152: Reliance on Israel's promotion of profitable trading.

244.    As a result of Defendants' wrongful conduct, as alleged herein, Plaintiffs have suffered economic damages in an amount to be established at trial, including, but not limited to, the loss of their principal investments, the loss of promised returns, and additional consequential damages.

245.    Defendants acted with scienter in committing the wrongful acts alleged herein, in that they knew or recklessly disregarded the true nature of their deceptive and manipulative conduct and were aware of its impact on Plaintiffs.

246.    Defendants are jointly and severally liable to Plaintiffs for substantial damages suffered in connection with their investments through FxWinning.

247.    Plaintiffs seek recovery of their damages from Defendants, along with interest, attorneys' fees, and any other relief the Court deems just and proper.

## COUNT XI

### VIOLATION OF THE SECURITIES ACT OF 1933, SECTION 17(A) AND (B), 15 U.S.C. § 77Q

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This count is against all Defendants.

248.    The Defendants: (a) employed devices, schemes, and artifices in interstate commerce to defraud; (b) made untrue statements of material fact; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs in violation of § 17(a) and (b) of the Securities Act.

249.    As alleged above, Defendants, individually and in concert, directly and indirectly, represented to Plaintiffs that the investment funds were held in accounts that would be used for forex trading safely and profitably.

- ¶111: Promotion of high-frequency trading with minimal error.

- ¶112: Promises of guaranteed monthly profits.

- ¶113: Misrepresentation of KYC/AML verifications.

- ¶122: Conflicting claims about where investor funds were held.

- ¶128: Approval of KYC applications despite illegitimacy.

- ¶129: FxWinning and CFT misleading investors about resuming operations.

250.    Defendants materially misrepresented the security, management, and profitability of Plaintiffs' investments, intentionally misleading them into believing their funds were safe and would yield substantial profits from forex trading through FxWinning and related entities.

- ¶111: Promotion of profitable, secure forex trading.

- ¶112: Assurances of high monthly returns.

- ¶114: Misleading registration of investors using fake IDs.

- ¶116: Creation of fake offshore corporations.

- ¶123: Misleading claims about withdrawal issues being temporary.

- ¶124: Provision of fake Haitian corporations to comply with KYC requirements.

- ¶125: Use of a lawsuit as a distraction.

- ¶129: Deceptive narrative to conceal illegitimacy of investments.

251.    Defendants' representations related to the purchase of securities, as Plaintiffs invested funds in a common enterprise, FxWinning, expecting profits solely from Defendants' efforts. These investments qualify as "securities" under the Securities Act, as Plaintiffs' funds were pooled and controlled entirely by Defendants.

- ¶111: Promotion of investment as a common enterprise with profits from Defendants' efforts.

- ¶112: Use of LPOAs tied to pooled investments.

- ¶115: Claims about broker scrutiny and investor oversight.

- ¶116: Misrepresentation of offshore corporations as legitimate entities.

- ¶123: Control of investment funds by FxWinning and CFT.

- ¶131: Collaboration between entities in executing the scheme.

252.    Defendants used interstate communications, including emails, phone calls, social media, and Telegram channels, to promote fraudulent investment schemes, inducing Plaintiffs from various states and abroad, including New Jersey, to invest in their securities operated from Florida and overseas affiliates.

- ¶111: Social media promotion of investment schemes.

- ¶114: Use of deceptive offshore registrations.

- ¶115: Telegram communications emphasizing broker rules.

- ¶126: Coordinated efforts involving international travel.

- ¶143: Facebook promotions by Israel influencing Plaintiffs.

- ¶152: Israel's social media posts promoting trading software.

253.    Defendants knowingly made materially false and misleading statements to solicit Plaintiffs' funds, manipulated the MT5 platform to fabricate profitable trading activity, withheld or forged critical investment information, and falsely claimed the legality and safety of creating offshore corporations to evade regulatory scrutiny.

- ¶111: Claims about the trading software's profitability and safety.

- ¶113: False assurances about KYC/AML compliance.

- ¶116: Fabrication of offshore corporations.

- ¶122: Conflicting statements about the location of funds.

- ¶125: Lawsuit against FxWinning as a distraction tactic.

- ¶129: Ongoing deception about withdrawal resumption.

- ¶150: Evidence of funds misappropriated to Bastos's accounts.

254.    Defendants knowingly misrepresented investment risks, performance, and the legitimacy of required offshore entities while concealing noncompliance with U.S. securities laws and FxWinning's inability to process withdrawals, thereby creating a false sense of security regarding the investments' profitability and safety.

- ¶113: Misrepresentation of investment risks tied to KYC/AML compliance.

- ¶116: Creation of fake offshore entities to mislead investors.

- ¶124: Use of fake Haitian corporations for KYC purposes.

- ¶129: Concealment of FxWinning's inability to process withdrawals.

- ¶140: Confirmation of fake Jamaican corporations.

- ¶146: Fraudulent Panamanian corporations provided to investors.

- ¶155: False claims about updated corporate filings.

255.   Had Plaintiffs known Defendants' misrepresentations were false, they would not have invested with FxWinning. Plaintiffs reasonably relied on these fraudulent claims, expecting their funds to be securely held and traded for promised returns.

- ¶111: Assurance of profitability through trading software.

- ¶112: Promises of guaranteed profits.

- ¶113: Misrepresentation of KYC/AML compliance.

- ¶125: Defendants' lawsuit used to distract Plaintiffs.

- ¶128: Approval of fraudulent KYC applications.

- ¶129: Misleading claims about the resumption of operations.

- ¶150: Discovery of misappropriated funds by Roman

256.   As a result of Defendants' misconduct, Plaintiffs suffered significant financial losses, including lost investments and economic damages, directly caused by Defendants' manipulation of trading data, forged documents, and deceptive scheme.

257.   Defendants are jointly and severally liable to Plaintiffs for substantial damages that Plaintiffs have suffered in connection with their accounts with FxWinning. Plaintiffs are entitled to recover all economic losses sustained as a result of Defendants' fraudulent acts, as well as interest, attorney's fees, and any other relief deemed appropriate by this Court.

## COUNT XII

## VIOLATION OF THE FLORIDA SECURITIES AND INVESTOR PROTECTION ACT, SECTIONS 517.301 and 517.211

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This count is against all Defendants.

258.    The investments made by Plaintiffs were "securities" as defined by the Florida Securities and Investor Protection Act, Section 517.301, Florida Statutes, et seq. (the "Florida Act").

259.    Section 517.301 of the Florida Act makes it unlawful for any person, in connection with the offer, sale, or purchase of any investment or security, directly or indirectly:

- To employ any device, scheme, or artifice to defraud;

- To obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading; or

- To engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon a person.

260.    As alleged above, Defendants violated the Florida Act by, among other things:

- Employing a device, scheme, or artifice to defraud Plaintiffs by misrepresenting the safety, profitability, and legitimacy of the investments offered;

- Making untrue statements of material facts, such as the potential returns on the investments and the authenticity of offshore corporate structures, while omitting material facts that would have revealed the fraudulent nature of the investments;

- Engaging in a series of deceptive acts, practices, and a continuous course of business that misled Plaintiffs about the security of their investments and operated as a fraud and deceit;

- Knowingly and willfully falsifying, concealing, or covering up, by trick, scheme, or device, material facts, making false, fictitious, or fraudulent statements or

representations, or making or using false writings or documents, knowing the same to contain false, fictitious, or fraudulent statements or entries.

261.    Defendants perpetuated their fraudulent schemes through various means, including but not limited to:

- Utilizing an official Telegram channel to conduct and promote their fraudulent investment scheme, misleading Plaintiffs into believing their investments were secure and lucrative;

- Facilitating the creation of fake offshore corporations to further conceal their fraudulent activities and prevent regulatory scrutiny;

- Misleading Plaintiffs into believing that by creating offshore corporations, they could avoid legal repercussions and enhance investment security, while the true intent was to misappropriate their funds;

- Organizing events, conventions, and meetings, such as the Bahamas convention, to lend legitimacy to the fraudulent scheme and induce further investments.

262.    Section 517.211 of the Florida Act provides for civil liability for these violations. It states that any person purchasing or selling a security in violation of Section 517.301, and every director, officer, partner, or agent of or for the purchaser or seller, if they have personally participated or aided in making the sale or purchase, is jointly and severally liable to the person selling the security to or purchasing the security from such person in an action for rescission, if the plaintiff still owns the security, or for damages, if the plaintiff has sold the security.

263.    Plaintiffs are each "person[s] … purchasing the security" from Defendants, and each Defendant constitutes either a person selling the security or a director, officer, or agent of the seller who personally participated or aided in making the sale.

264.    Defendants have directly sold securities to Plaintiffs or have aided in making the sale of securities as a director, officer, partner, or agent of the seller for such securities.

265.    Pursuant to the Florida Act, Defendants are jointly and severally liable to Plaintiffs as sellers of the securities. Defendants' fraudulent actions directly contributed to the Plaintiffs' losses and continue to affect them.

266.    Plaintiffs have been, and continue to be, directly and indirectly injured and damaged as a result of Defendants' schemes, acts, practices, and courses of business that operated to deceive Plaintiffs concerning the investments in question. These actions were in violation of the securities laws of the State of Florida, causing Plaintiffs to suffer financial losses in an amount to be proven at trial, including interest from the date of the purchase of the investment and attorney's fees.

**COUNT XIII**

**CONVERSION**

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This count is against all Defendants.

267.    The Defendants, acting in concert with one another, knowingly and willfully orchestrated the setup and operations of CFT and FxWinning with the specific intent to deceive investors, such as the Plaintiffs, and to unlawfully appropriate their funds for their own benefit.

- ¶111: Promotion of profitable and secure investments through deceptive endorsements.
- ¶114: Use of fake Jamaican IDs and deceptive registration methods.

- ¶116: Creation of fake offshore corporations for fraudulent purposes.

- ¶120: Forgery of KPMG validation letter to bolster credibility.

- ¶125: Smokescreen lawsuit to deflect legal actions and buy time.

- ¶127: Misappropriation of funds through internal transfers.

- ¶131: Coordination between CFT and FxWinning in executing the fraudulent scheme.

268.    In reliance on the Defendants' false representations regarding the safety, profitability, and legitimacy of their investments through CFT and FxWinning, the Plaintiffs transferred substantial sums of money to FxWinning. These transfers were facilitated by the Defendants, who accepted the funds under false pretenses.

- ¶111: Assurance of safe and profitable investments.

- ¶112: Promises of guaranteed monthly profits.

- ¶114: Facilitation of investments through fake Jamaican IDs.

- ¶115: False assurances of broker scrutiny.

- ¶127: Internal transfers misappropriating funds.

- ¶148: Roman's large deposit sent to El's personal account under false pretenses.

269.    Despite the Plaintiffs' repeated and timely demands for the return of their funds, the Defendants, acting through CFT and FxWinning, have consistently refused to return the monies owed.

- ¶123: FxWinning ceased withdrawals in 2023, citing verification delays.

- ¶128: Plaintiffs' documents were approved, but withdrawals were denied.

- ¶129: FxWinning shut down, leaving funds inaccessible.

270.    The Defendants continue to wrongfully retain the Plaintiffs' funds, without any lawful justification, under the guise of fraudulent schemes and misrepresentations, as described in detail above.

- ¶116: Fake offshore corporations to mislead investors.

- ¶123: Continued denial of withdrawals.

- ¶127: Diversion of funds to Bastos's accounts.

- ¶128: KYC approvals despite knowing documents were illegitimate.

- ¶130: FxWinning's financial struggles, casting doubt on the funds' whereabouts.

271.    By refusing to return the funds and exercising dominion and control over the Plaintiffs' property without the Plaintiffs' consent, the Defendants have unlawfully converted the Plaintiffs' property for their own use and benefit. Such actions were done, and continue to be done, intentionally, knowingly, and without legal justification.

- ¶127: Misappropriation of funds through internal transfers to Bastos's accounts.

- ¶148: Roman's funds sent to El's personal account and misdirected.

- ¶150: Text messages revealing that investors' funds were transferred to Bastos's wallets.

272.    The Defendants' actions constitute an unlawful conversion of the Plaintiffs' interest in their funds, as they have been deprived of their rightful ownership and use of their property, which was obtained through deceit and fraudulent conduct.

- ¶148: Roman's funds misappropriated by El.

- ¶150: Confirmation of Bastos retaining investors' funds.

- ¶127: Misappropriation of funds through internal transfers.

273.    The Defendants acted with malicious intent, recklessness, and complete disregard for the rights of the Plaintiffs. Their conduct was designed to cause, and has caused, substantial economic harm to the Plaintiffs by depriving them of their funds and

by making false assurances and representations to delay, deflect, and evade rightful restitution.

- ¶125: Smokescreen lawsuit to delay legal actions.

- ¶123: False reassurances about the safety and eventual return of funds.

- ¶129: Delay tactics by FxWinning and CFT to evade accountability.

- ¶130: Conflicting narratives about funds' whereabouts, deepening the Plaintiffs' losses.

274.    As a direct and proximate result of the Defendants' unlawful conduct, including the fraudulent inducement, deceitful retention of funds, and refusal to honor lawful requests for return, the Plaintiffs have sustained damages in the amount of over $2.3 million, plus interest, costs, and any other relief deemed appropriate by the Court.

## COUNT XIV
## UNJUST ENRICHMENT

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This count is against all Defendants.

275.    The Defendants will be unjustly enriched if they are allowed to retain Plaintiffs' funds, which were provided based on false representations and fraudulent inducements regarding the safety, legality, and profitability of the investments offered by Defendants.

- ¶111: Promotion of safe and profitable investments.

- ¶112: Promises of guaranteed monthly profits.

- ¶114: Use of deceptive tactics to include North American investors.

- ¶116: Creation of fake offshore corporations.

- ¶126: Coordination between CFT and FxWinning to enhance credibility.

- ¶127: Misappropriation of funds through internal transfers.

- ¶129: Denial of withdrawals despite claims of legitimacy.

- ¶147: Roman discovering her Panamanian corporation was fake.

- ¶150: EL transferring funds to Bastos's crypto wallets.

276.    As alleged above, Plaintiffs transferred funds to FxWinning through their accounts, relying on Defendants' assurances that their investments would be managed according to stated terms, with profits generated through the CFT trading software and brokerage services of FxWinning.

- ¶111: Claims about the profitability and safety of CFT's trading software.

- ¶112: Representations regarding profit-sharing agreements.

- ¶113: Misrepresentation of KYC/AML verifications.

- ¶115: Statements about broker scrutiny and investor identification.

- ¶116: Use of offshore corporations as a condition for investment.

- ¶141: Santana's assurances about investment security.

- ¶143: Israel's promotional efforts influencing Plaintiffs.

- ¶152: Israel's social media posts about profitability convincing Plaintiffs.

277.    Defendants, including their leaders and agents, received Plaintiffs' funds and gained financial benefits such as commissions from trading activity, fees for creating fake offshore corporations, and recruitment incentives.

- ¶112: Sharing of profits through the LPOA agreement.

- ¶113: Misrepresentation of investment management practices.

- ¶116: Collection of fees for fake offshore corporations.

- ¶127: Financial gains from misappropriated funds.

- ¶145: Fees paid to create fake Panamanian corporations.

- ¶146: Charges for counterfeit corporate documents.

- ¶150: Transfer of funds to Bastos's personal crypto wallets.

- ¶154-155: Additional fees demanded for fraudulent offshore corporations.

278.    Despite Plaintiffs' repeated withdrawal requests under their contractual rights, Defendants refused to release funds, citing false liquidity issues, imposing fabricated KYC/AML requirements, and coercing Plaintiffs into obtaining fraudulent offshore corporations, enriching Defendants at Plaintiffs' expense.

- ¶113: Imposed KYC/AML requirements as a pretext for withholding funds.

- ¶114: Deceptive onboarding of U.S. investors through offshore corporations.

- ¶119: Liquidity provider's demands triggering verification requirements.

- ¶121: Discovery of irregularities leading to frozen withdrawals.

- ¶122: Contradictory statements about the location of funds.

- ¶123: Complete cessation of withdrawals under false pretenses.

- ¶128: Approval of fake documents without releasing funds.

279.    Defendants unjustly retained Plaintiffs' funds and ill-gotten gains through misappropriation, transferring funds to personal cryptocurrency wallets, fabricating trading activity, and denying Plaintiffs rightful access to their investments.

- ¶113: Use of fabricated KYC/AML requirements to deny withdrawals.

- ¶116: Creation and use of fake offshore corporations.

- ¶121: Discovery of irregularities and denial of withdrawals.

- ¶123: Continued refusal to release funds while providing false reassurances.

- ¶127: Transfer of funds to personal cryptocurrency wallets.

- ¶150: Specific misappropriation of Roman's funds

280.    Plaintiffs have been and will continue to suffer damages, in an amount in excess of $2.3 million, as a result of Defendants' actions. This amount reflects both the

unreturned principal deposits and the purported profits shown on trading platforms manipulated by the Defendants, as well as additional fees charged for fabricated offshore entities.

281.    Plaintiffs seek restitution for the full amount of transferred funds, including unjustly received commissions, fees, and financial benefits, along with costs, interest, and other appropriate relief. Plaintiffs also demand disgorgement of all profits and benefits derived from Defendants' wrongful conduct to restore the status quo.

## COUNT XV

## NEGLIGENT MISREPRESENTATION

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This count is against all Defendants.

282.    Defendants, through various communications, including social media, personal meetings, conventions, and official Telegram channels, made numerous representations to Plaintiffs regarding the safety, profitability, and regulatory compliance of CFT's trading platform and services.

- ¶111: Promotion of investment safety and profitability using advanced algorithms.

- ¶112: Guaranteed monthly profits promised through agreements.

- ¶118: Conventions and political endorsements to bolster legitimacy.

- ¶131: Coordination between CFT and FxWinning to appear independent yet compliant.

- ¶132: Defendants' communications with NJ Plaintiffs about their investments.

- ¶141: Assurance of profitability and safety by Santana.

- ¶152-153: Social media promotions by Israel and Marshall's support.

283.    Defendants, including the CEO, COO, and their agents, represented to Plaintiffs that CFT's trading platform and services would yield historically high rates of return through its purported unique forex trading mechanisms and software, when in fact, these representations were materially false and misleading.

- ¶111: Claims of profitability using algorithms comparable to major banks.

- ¶112: Representations of high monthly returns through LPOAs.

- ¶126: Coordination to secure insurance for the operation.

- ¶129: Continued denial of withdrawals despite approvals.

- ¶143: Israel's promotion of profitability through social media.

- ¶152: Israel's use of Facebook to promote high returns.

284.    Defendants, by virtue of their positions within the Companies and their direct interactions with Plaintiffs, had a duty to provide accurate and truthful information concerning the trading platform, including its historical performance, risk factors, and regulatory status.

- ¶111: Promises of safety and high returns through sophisticated trading.

- ¶114: Use of deceptive practices, including false ID registration.

- ¶115: Claims that investors couldn't evade scrutiny.

- ¶118: Efforts to legitimize through political and regulatory steps.

- ¶128: Approvals of KYC applications despite fraudulent documentation.

285.    Defendants breached this duty by providing false and misleading information and omitting material facts about CFT's trading platform and services,

including falsely claiming that their services were not available in the U.S. while simultaneously targeting U.S.-based investors.

- ¶113: False claims about KYC/AML processes.

- ¶114: Falsely denying acceptance of U.S.-based investors while onboarding them.

- ¶118: Misleading assurances during conventions.

- ¶120: Forgery of a letter from KPMG Spain.

- ¶128: Misleading Plaintiffs about the validity of their document approvals.

286.    Defendants further represented that Plaintiffs' investments were secure and would be managed through legitimate offshore corporations, when in fact, these entities were fabricated or non-existent, causing Plaintiffs to believe their funds were protected when they were not.

- ¶116: Fabrication of offshore entities.

- ¶137: Use of fake Jamaican and Haitian corporations for Plaintiffs.

- ¶146: Roman's experience with fake Panamanian corporations.

- ¶150: Transfer of funds to Bastos's cryptocurrency accounts.

- ¶156: Masters' discovery of fake Panamanian corporations.

287.    Defendants either intended for Plaintiffs to rely on these misrepresentations or knew that Plaintiffs would reasonably rely on them when deciding to invest substantial sums of money in CFT's trading platform.

- ¶111: Promotion of safety and profitability to attract investments.

- ¶112: Promises of monthly profits.

- ¶114: Use of deceptive onboarding practices.

- ¶116: Fabrication of offshore corporations to instill trust.

- ¶123: Misleading communications about temporary withdrawal issues.

- ¶143: Social media influence by Israel.

288.    Defendants failed to exercise reasonable care in ascertaining or communicating the true nature of the trading platform and services provided by CFT, including the accurate historical rates of return, the authenticity of the recommended offshore entities, and the safety of the Plaintiffs' investments.

- ¶114: Use of fake IDs and deceptive practices.

- ¶116: Creation of fraudulent offshore corporations.

- ¶120: Use of a forged KPMG letter.

- ¶137: Nonexistent Jamaican corporations for Plaintiffs.

- ¶145: Roman's Panamanian corporation handled through forged documentation.

289.    As a result of Defendants' negligent misrepresentations, Plaintiffs were induced to invest and maintain investments in CFT's trading platform, resulting in substantial financial losses.

- ¶117: Red flag policies that deterred withdrawals.

- ¶123: Cessation of withdrawals and misleading reassurances.

- ¶126: Coordinated efforts to legitimize fraudulent activities.

- ¶128: Continued denial of withdrawals despite approvals.

- ¶140: Discovery of non-existent Jamaican corporations.

- ¶150-151: Diversion of Plaintiffs' funds to personal accounts and ultimate financial losses.

290.   Plaintiffs reasonably and justifiably relied on the Defendants' representations, believing them to be accurate and truthful, and took actions, including investing funds and entering agreements, based on such reliance.

## COUNT XVI

## VIOLATION of the COMMODITY EXCHANGE ACT –

## (7 U.S.C. § 1 et seq.)

Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein. This count is against all Defendants.

291.   Under the Commodity Exchange Act (CEA), codified at 7 U.S.C. § 1 et seq., it is unlawful for any person to engage in manipulative, deceptive, or fraudulent practices in connection with the sale of commodities, including foreign exchange (forex) contracts. Specifically, under 7 U.S.C. § 6b(a), it is prohibited to defraud or mislead any participant in a commodities transaction. Further, under 7 U.S.C. § 13(a)(2), individuals or entities engaging in willful manipulation or schemes intended to defraud may be held liable for civil and criminal penalties.

7 U.S.C. § 6b(a)(2) states:

*"It shall be unlawful for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or in connection with any order to make, or the making of, any contract of sale of a commodity for future delivery (including any contract commonly known to the trade as a 'margin account,' 'margin contract,' 'leverage account,' or 'leverage contract') ... to cheat or defraud or attempt to cheat or defraud the other person or willfully to deceive or attempt to deceive the other person."*

292.    Defendants fraudulently promoted forex investment contracts, falsely claiming their high-frequency trading software guaranteed monthly returns of 15% to 20%, misleading Plaintiffs into investing substantial sums under the pretense of safety and profitability.

- **¶111**: Claims about the high-frequency trading software guaranteeing safety and profitability.

- **¶112**: Promises of guaranteed monthly returns of 15% to 20%.

293.    Defendants used deceptive practices, including creating offshore corporations and fake IDs, to misrepresent Plaintiffs' identities and evade U.S. regulatory scrutiny, violating the CEA's prohibition on deceptive practices.

- ¶114: Use of fake Jamaican IDs and offshore registrations for U.S. investors.

- ¶115: Misrepresentation of compliance with broker scrutiny.

- ¶116: Creation of fake offshore corporations.

- ¶124: Use of fake Haitian corporations by Israel to mislead investors.

294.    The Limited Power of Attorney (LPOA) agreements stated that KYC and AML verifications would be conducted before trading commenced. However, no such verifications were performed, as evidenced by the fraudulent documentation and false assurances provided by Defendants to Plaintiffs. This omission constitutes a material misrepresentation in connection with commodities trading, directly violating 7 U.S.C. § 6b(a)(2).

- ¶113: LPOA provisions promising KYC/AML verifications but failing to deliver, constituting material misrepresentation.

295.    Defendants misappropriated Plaintiffs' investments by funneling funds through CFT agents and executing "internal transfers" that ultimately routed the money into the private cryptocurrency accounts of Defendant Bastos and other insiders. This misuse of commodities funds constitutes a direct violation of the CEA, which prohibits fraud, misrepresentation, and misappropriation in commodities transactions.

- ¶127: Funneled funds through internal transfers to Bastos's cryptocurrency accounts.
- ¶149: EL's diversion of Roman's funds to personal accounts and internal transfers leading to Bastos.

296.    Defendants CFT and FxWinning conducted commodities transactions without being registered as a commodity pool operator (CPO) or commodity trading advisor (CTA), as required under 7 U.S.C. § 6m(1). Furthermore, Defendants failed to comply with disclosure and record-keeping requirements mandated by the Commodity Futures Trading Commission (CFTC), further evidencing their intent to operate outside regulatory boundaries.

297.    Defendants implemented a "red flag" policy restricting significant withdrawals to obscure their fraudulent activities and maintain liquidity, trapping Plaintiffs' investments. Additionally, conflicting narratives regarding the location of Plaintiffs' funds—allegedly held by B2Broker, FxWinning, or Defendant Bastos—further demonstrate Defendants' intent to conceal misappropriated assets.

- ¶117: Implementation of the "red flag" policy to restrict withdrawals.
- ¶122–123: Conflicting narratives about the location of funds—B2Broker, FxWinning, or Bastos.

298.   As detailed above, Defendants' actions constitute willful violations of the Commodity Exchange Act, including fraud, deceptive practices, and misappropriation of Plaintiffs' investments. Plaintiffs are entitled to relief under the CEA, including restitution of all misappropriated funds, disgorgement of ill-gotten gains, civil penalties, and attorney's fees, as provided under 7 U.S.C. § 13a-1.

## PROTECTION AGAINST PARTIAL SETTLEMENT

Given the nature of the claims and the collective harm suffered by all Plaintiffs as a result of Defendants' fraudulent scheme, the Plaintiffs request that the Court ensure any proposed settlement, resolution, or offer made by the Defendants is presented to all Plaintiffs as a unified group. This protection is necessary for the following reasons:

### Interdependence of Claims

The Plaintiffs' claims arise from a common nucleus of operative facts, including the Defendants' fraudulent representations, use of manipulated trading software, and deceptive practices across multiple jurisdictions. Any resolution with only the New Jersey Plaintiffs would prejudice the rights of the other Plaintiffs, as their claims are inextricably linked to those of the group.

### Procedural Integrity

Allowing Defendants to selectively settle with the New Jersey Plaintiffs could create jurisdictional issues for the remaining Plaintiffs, potentially undermining the Court's ability to adjudicate the entire matter and leading to fragmented litigation.

### Good Faith and Equity

Given the Defendants' history of deceit and manipulation, selective settlements may serve as a tactic to disrupt the cohesion of the Plaintiffs and evade full accountability. The Court should ensure that all settlement discussions occur transparently and inclusively, to preserve equity and protect all Plaintiffs' interests.

## PRAYER FOR RELIEF

292.    Plaintiffs have suffered damages in an amount to be determined at trial, but in no event less than $2.4 million, as a direct and proximate result of Defendants' negligent misrepresentations and failure to provide accurate information.

WHEREFORE, Plaintiffs respectfully request that this Court:

a. Award compensatory damages in an amount to be determined at trial, but no less than $2.4 Million, for the losses and damages suffered by Plaintiffs as a result of Defendants' unlawful conduct.

b. Award treble damages as provided under applicable law for the fraudulent and malicious actions of Defendants.

c. Order that Plaintiffs' funds be immediately released and returned to Plaintiffs, including all amounts held by Defendants and their associates.

d. Direct an accounting of all sums received by Defendants, individually, and any proceeds derived from the withheld funds.

e. Order disgorgement of any and all ill-gotten gains acquired by Defendants through their fraudulent activities.

f. Impose a constructive trust over all accounts held by Defendants, including but not limited to bank accounts and cryptocurrency wallets, to secure Plaintiffs' interests.

g. Award punitive damages against Defendants to punish their egregious conduct and deter future similar misconduct.

h. Issue an injunction enjoining Defendants (and anyone acting in concert with Defendants) from moving, transferring, or otherwise disposing of Plaintiffs' funds or assets.

i. Award pre-judgment and post-judgment interest on all amounts owed to Plaintiffs to compensate for the delay in justice.

j. Award Plaintiffs' attorneys' fees and costs incurred in prosecuting this action, including expert fees and other related expenses.

k. Grant all other and further relief as the Court deems just and proper, including any additional remedies necessary to fully address the harm suffered by Plaintiffs.

Additionally, Plaintiffs request that the Court:

1. Rule on jurisdiction based on the evidence presented and, if sufficient, affirm the Court's jurisdiction over this matter.
2. Require all settlement offers or proposals to be disclosed to all Plaintiffs collectively.
3. Prohibit Defendants from selectively resolving claims with specific Plaintiffs without Court approval and notice to the remaining Plaintiffs.
4. Recognize the collective nature of the claims in any procedural orders or rulings to ensure fair and consistent adjudication.

Dated: April 18, 2025


Respectfully submitted,


1. Gabriela Janeta Roman – Pro Se
   Address: 10020 NW 50th Manor
   Coral Springs, FL 33076
   Phone: (954)682-1985
   Email: roma1531@gmail.com

   _____
   Plaintiff's Signature


2. Christopher Emanuel Szabo – Pro Se
   Address: 10020 NW 50th Manor
   Coral Springs, FL 33076
   Phone: (954)682-2988
   Email: christopheremanuelszabo@gmail.com

   _____
   Plaintiff's Signature


3. Khaled Elsisi – Pro Se
   Address: 735 Galloping Hill Rd
   Union, NJ 07083
   Phone: (201)365-8524
   Email: khaled_elsisi19@hotmail.com

   _____
   Plaintiff's Signature

4. Linwood Walker – Pro Se
   Address: 63 Elm Street
   Florham Park, NJ 07933
   Phone: (973)525-7790
   Email: Lwalker3402@yahoo.com

   *Linwood Walker*
   Plaintiff's Signature

5. Najy Kanan – Pro Se
   Address: 5 McCabe Ct
   Little Ferry, NJ 07643
   Phone: (201)600-2770
   Email: Najy123@gmail.com

   *Najy Kanan*
   Plaintiff's Signature

6. Robert Yeng – Pro Se
   Address: 46 Marina Drive
   Bayonne, NJ 07002
   Phone: (201)238-0074
   Email: ryeng2012@gmail.com

   *Robert Yeng*
   Plaintiff's Signature

7. Luis Pinos – Pro Se
   Address: 199 Alton St
   Elizabeth, NJ 07202
   Phone: (201)838-5897
   Email: luispinos64@yahoo.com

   *Luis Pinos*
   Plaintiff's Signature

8.  Ahmed Sharafeldin – Pro Se
    Address: 482 Avenue E
    Bayonne, NJ 07002
    Phone: (201)253-9960
    Email: ahmed.m.sharafeldin@gmail.com

    *Ahmed Sharafeldin*
    Plaintiff's Signature

9.  Ricardo Marquez – Pro Se
    Address: 122 Watson Ave
    Newark, NJ 07112
    Phone: (732)322-6866
    Email: MARQUEZSALES16@gmail.com

    *Ricardo Marquez*
    Plaintiff's Signature

10. Barry Rosner – Pro Se
    Address: 50 Morris Ave, Fl 1
    Summit, NJ 07901
    Phone: (973)960-6520
    Email: barry.rosner@route22toyota.com

    *Barry Rosner*
    Plaintiff's Signature

11. Ahmed Khedr – Pro Se
    Address: 358 Kettle Creek Rd #4
    Toms River, NJ 08753
    Phone: (732)664-5502
    Email: ahmedkhedr5161@gmail.com

    *Ahmed Khedr*
    Plaintiff's Signature

12. Asher Bomani Lewis – Pro Se
Address: 3668 El Toro Street
Las Vegas, NV 89121
Phone: (909)635-7445
Email: inevitablegains@gmail.com

*Asher Lewis*
_____
Plaintiff's Signature

13. Stuart Wayne Springfield – Pro Se
Address: 14/3 Ferguson Street
Maylands 6051 Western Australia
Phone: 61-438-241-970
Email: stuartspringfield@gmail.com

_____
Plaintiff's Signature

14. Christine Linda Masters – Pro Se
Address: 14/3 Ferguson Street
Maylands 6051 Western Australia
Phone: 61-416-802-023
Email: chrissy.masters@icloud.com

_____
Plaintiff's Signature

15. Juan Junior Nicasio – Pro Se
Address: 67 Pearl Street
Paterson, NJ 07501
Phone: (973)389-3827
Email: nicasioonline@gmail.com

*Juan Nicasio*
_____
Plaintiff's Signature

16. Aliqwan Pack – Pro Se
    Address: 30 Circle Drive, A
    Tiburon, CA 94920
    Phone: (732)640-7741
    Email: aliqwanpack@gmail.com

    *Aliqwan Pack*
    _____

    Plaintiff's Signature


**CERTIFICATE OF SERVICE**

We hereby certify that on April 18, 2025, a copy of the foregoing document and exhibits
was served on all counsel of record via email.


1. Gabriela Janeta Roman – Pro Se
   Address: 10020 NW 50th Manor
   Coral Springs, FL 33076
   Phone: (954)682-1985
   Email: roma1531@gmail.com

   _____
   Plaintiff's Signature


2. Christopher Emanuel Szabo – Pro Se
   Address: 10020 NW 50th Manor
   Coral Springs, FL 33076
   Phone: (954)682-2988
   Email: christopheremanuelszabo@gmail.com

   _____
   Plaintiff's Signature

3. Khaled Elsisi – Pro Se
   Address: 735 Galloping Hill Rd
   Union, NJ 07083
   Phone: (201)365-8524
   Email: khaled_elsisi19@hotmail.com

   *Khaled Elsisi*
   Plaintiff's Signature

4. Linwood Walker – Pro Se
   Address: 63 Elm Street
   Florham Park, NJ 07933
   Phone: (973)525-7790
   Email: Lwalker3402@yahoo.com

   *Linwood Walker*
   Plaintiff's Signature

5. Najy Kanan – Pro Se
   Address: 5 McCabe Ct
   Little Ferry, NJ 07643
   Phone: (201)600-2770
   Email: Najy123@gmail.com

   *Najy Kanan*
   Plaintiff's Signature

6. Robert Yeng – Pro Se
   Address: 46 Marina Drive
   Bayonne, NJ 07002
   Phone: (201)238-0074
   Email: ryeng2012@gmail.com

   *Robert Yeng*
   Plaintiff's Signature

7. Luis Pinos – Pro Se
   Address: 199 Alton St
   Elizabeth, NJ 07202
   Phone: (201)838-5897
   Email: luispinos64@yahoo.com

   *Luis Pinos*
   _____
   Plaintiff's Signature

8. Ahmed Sharafeldin – Pro Se
   Address: 482 Avenue E
   Bayonne, NJ 07002
   Phone: (201)253-9960
   Email: ahmed.m.sharafeldin@gmail.com

   *Ahmed Sharafeldin*
   _____
   Plaintiff's Signature

9. Ricardo Marquez – Pro Se
   Address: 122 Watson Ave
   Newark, NJ 07112
   Phone: (732)322-6866
   Email: MARQUEZSALES16@gmail.com

   *Ricardo Marquez*
   _____
   Plaintiff's Signature

10. Barry Rosner – Pro Se
    Address: 50 Morris Ave, Fl 1
    Summit, NJ 07901
    Phone: (973)960-6520
    Email: barry.rosner@route22toyota.com

    *Barry Rosner*
    _____
    Plaintiff's Signature

11. Ahmed Khedr – Pro Se
    Address: 358 Kettle Creek Rd, #4
    Toms River, NJ 08753
    Phone: (732)664-5502
    Email: ahmedkhedr5161@gmail.com

    *Ahmed Khedr*
    _____
    Plaintiff's Signature

12. Asher Bomani Lewis – Pro Se
    Address: 3668 El Toro Street
    Las Vegas, NV 89121
    Phone: (909)635-7445
    Email: inevitablegains@gmail.com

    *Asher Lewis*
    _____
    Plaintiff's Signature

13. Stuart Wayne Springfield – Pro Se
    Address: 14/3 Ferguson Street
    Maylands 6051 Western Australia
    Phone: 61-438-241-970
    Email: stuartspringfield@gmail.com

    _____
    Plaintiff's Signature

14. Christine Linda Masters – Pro Se
    Address: 14/3 Ferguson Street
    Maylands 6051 Western Australia
    Phone: 61-416-802-023
    Email: chrissy.masters@icloud.com

    _____
    Plaintiff's Signature

15. Juan Junior Nicasio – Pro Se
    Address: 67 Pearl Street
    Paterson, NJ 07501
    Phone: (973)389-3827
    Email: nicasioonline@gmail.com

    *Juan Nicasio*
    _____
    Plaintiff's Signature

16. Aliqwan Pack – Pro Se
    Address: 30 Circle Drive, A
    Tiburon, CA 94920
    Phone: (732)640-7741

    Email: aliqwanpack@gmail.com

    *Aliqwan Pack*
    _____
    Plaintiff's Signature